101 Cal.Rptr.2d 760 (2000)
85 Cal.App.4th 177
In re RUBISELA E., a Person Coming Under the Juvenile Court Law.
Los Angeles County Department of Children and Family Services, Plaintiff and Respondent,
v.
Ruben E, Defendant and Appellant.
No. B137665.
Court of Appeal, Second District, Division Two.
October 31, 2000.
*761 Steven D. Shenfeld, under appointment by the Court of Appeal, for Defendant and Appellant.
Lloyd W. Pellam, County Counsel and Jill Regal, Deputy County Counsel for Plaintiff and Respondent.
COOPER, J.
Ruben E. (Father) appeals following the juvenile's court's adjudication and disposition of a petition alleging he had molested his oldest daughter. That child, Rubisela E., was removed from the home; the other five children in the family were also found to be within the jurisdiction of the juvenile court but were allowed to remain in the home of their mother, with appellant Father allowed monitored visitation. He contends that substantial evidence does not support the juvenile court's decision and that the Department has not proved violation of Welfare and Institutions Code section 300, subdivisions (b), (c), (d), and (j). We shall reverse jurisdiction as to the sons, modify the jurisdictional order and otherwise affirm.

PROCEDURAL HISTORY AND STATEMENT OF FACTS

The petition
The petition in this matter was filed June 21, 1999, alleging that the six minor children of Odulia (Mother) and Father came within the jurisdiction of the juvenile court under Welfare and Institutions Code section 300, subdivisions (b), (c), (d), (i), and (j).[1] The incident giving rise to the petition occurred on June 17, 1999, involved the alleged sexual abuse of the oldest child by Father. It was initially alleged that Father "sexually abused the child Rubisela which included, but was not limited to asking the child Rubisela to orally copulate him, and attempted sexual intercourse." As amended after the hearing, the allegation was that Father sexually abused Rubisela "on multiple occasions" which included, but was not limited to asking the child to orally copulate him on June 17; the allegation regarding attempted intercourse was deleted.

Proceedings prior to adjudication hearing
The alleged incident of Father asking for oral copulation happened in the middle of the night on June 17, 1999. The matter came to the attention of the authorities when at school the day of the incident, *762 Rubisela reported the incident to a friend and then to a teacher. A counselor contacted by the teacher reported the incident to the police, who then interviewed Rubisela.
The police report upon detaining the children gave a brief summary of the alleged offense, stating that the suspect is the victim's father, who awoke her in the middle of the night. She discovered her shorts pulled down, but her underwear was still on. Father stated to the victim in Spanish "suck right here."
The report related the interview with the victim at Rubisela's school. According to the report, she told them that at about 1 a.m. on June 17, 1999, she was "sleeping on living room floor while her parents slept on a bed in the living room as well. Vict awoke to an unknown noise and stood up to investigate [noise]. Vict lost her balance due to the fact her shorts were down just above her knees. Vict added that she was wearing an additional pair of shorts underneath and was never nude. While vict was on her knees, her head was waist level of [her] father ..., she observed Susp standing appox 3' away wearing only a pair of shorts. Susp stated to Vict in Spanish while facing her, `Suck right here.' Vict immediately became upset, began to cry and looked away, Sus then replied, `Are you scared?', Vict nodded her head yes, Susp began apologizing and kissed her on the forehead goodnight and walked into the kitchen without further incident. Vict could not clearly see due to the dark and is unaware if Susp was pointing to any specific area on his body while making his statements. No contact or exposure occurred during the incident." The report continued that "Vict stated everything was back to normal and no mention of what had happened earlier that morning was brought up by Susp. Vict waited for Susp to go to work, as soon as he left, she told her brother (Renau) and sister (Yesenia) what had happened with her father that morning." Rubisela added that this type of action "had never happened before with her father." All six children were taken into protective custody.
The initial assessment reported that Rubisela made the following statement:
"[O]n 6-17-99 about 1:00 a.m. she was awakened by a noise and noticed Father was right beside her with his arm around her neck. Minor indicated she then noticed that her short[s] were down and asked Father what he was doing. Minor stated Father told her to `suck his penis.' Victim stated she kicked and tried to get up. However she fell because her underpants were up to her knees. Rubisela said she confronted her father with the fact `I am your daughter you are not suppose to do this to me'. Minor further stated she told her father she would tell her mother and call the police. According to victim once this was said Father left the room and told her to go back to sleep. Minor stated she did not tell her mother immediately because Mother was not home she works at night.
"Rubisela said she did not tell her mother in the morning because she had to go to school. The Minor explained that she and her sibling sleep on the floor. She indicated there is only two beds where her parents sleep and one bed where he[r] older brother sleeps. When the incident happened Father was next to her on the floor where she was sleeping. She indicated her sister was sleeping also on the floor but she did not wake up. Minor denied any further incident and indicated this was an isolated one."
Siblings Yesenia, Renau and Gustavo denied any sexual or other abuse by their parents and stated that they did not see anything the day of the incident. Those siblings all wanted to return to the home of parents. Rubisela was afraid for her parents and did not want her father to be angry with her.
Mother was interviewed and said she was not aware of the abuse and it is "impossible" that her husband could do such a *763 thing and her daughter must be lying.[2] However, Mother further stated "that when she comes home at night from work she sneaks in the house to see if she observed her husband or the children doing something wrong."[3] She always observed her husband sound asleep; she believed he is an honest man who would not do wrong to the children. Father denied the allegations and stated it was impossible he could be accused of such a thing.
The parties appeared June 22, 1999. The juvenile court found a prima facie case for detaining the minors and showing they were persons described by the alleged subdivisions. Rubisela was detained in shelter care and was to enroll in individual counseling.[4] Her siblings were ordered released to Mother on the condition that Father not reside in the home and have no unmonitored visits in the family home, and Mother was not to be the monitor of Father in the home. Parents were ordered not to discuss the case with any of the children. The Department was permitted to make unannounced home visits.
Rubisela, her parents, and some of her siblings were interviewed for the Department's jurisdictional/disposition hearing report for August 17, 1999.[5] Father refused a face to face interview, stating he was too busy, but was interviewed by phone. He denied making any sexual comment or other abuse to his daughter or any of his children and cannot understand why she is accusing him of such things. According to Father, Rubisela had been expelled from school for fighting and recently had to go to court for behavior problems. She had also been very disrespectful toward him and Mother and yelled "awful things at her .... including telling Mother that the Minor hated her mother."
Mother, interviewed in person, stated she did not believe the allegations and thought Rubisela was lying. Mother denied any knowledge of the sexual comment allegedly made by Father and stated she never saw him touch her daughters in an inappropriate manner. Furthermore, she never suspected any inappropriate behavior by Father. Rubisela had not reported such comments to Mother, nor had either daughter disclosed sexual abuse to her. Moreover, Mother reported that she and Father found Rubisela talking to a boy in the middle of the night outside of the apartment and reported the Minor has had numerous boyfriends in the past at school; Mother denied knowing if her daughter has been sexually active, but stated Rubisela had been expelled from school in the past for fighting, did not like to do home chores, had been disrespectful to her parents, and had "attempted to dress very provocative." The Department was concerned about Mother's not believing Rubisela and accusing the child of lying. On the other hand, Mother seemed to be in compliance with the court order not allowing Father to remain in the home.
*764 Siblings Renau and Yesenia also reported they had never seen Father sexually molest Rubisela or any of the children, there was no domestic abuse between their parents and neither parent hit them. Renau believed Rubisela was lying; Rubisela told him she was screaming the day of the incident, but he did not hear anything.[6] Sister Yesenia reported that after the detention, Rubisela told her and Mother that she saw Father standing over her on several occasions; Rubisela would ask what he was doing, and he would just walk away. Yesenia denied awakening at night to find Father standing, over her or Rubisela.
Interviewed on August 11, 1999, Rubisela told investigator Martinez that she was sleeping in the bedroom with sister Yesenia and brother Marvin while her mother was working late the night of June 17, 1999. She was awakened by a noise about 1 a.m. (which she knew because she saw the time on the stereo clock.) Rubisela stood up to go to the bathroom and tripped on a pillow. Then her father came over and attempted to help her get up. As she felt him kneeling next to her, Father told her "Chupame aqui" (Suck me here). She told him "I am your daughter and you are not suppose to talk to me this way." He said he was sorry and asked her to please forgive him. She was scared. Her father told her to go back to sleep and he walked out of the room. When asked, she denied that Father had ever touched her breast, vagina or buttocks, or asked her to touch his penis. Rather, contrary to testimony she would later give, this was the first time Father had ever attempted to sexually molest her or made a sexual comment to her.
Rubisela reported the room was too dark to see anything and denied she saw his penis. She added that she was sleeping in her tight jean shorts and when she was awakened, they were down to her knees. Her jean shorts were tight and buttoned when she went to sleep. Furthermore, she reported that she always sleeps fully clothed and that on that night she was wearing underwear, tight sports shorts, and her jeans shorts.
She admitted being in two fights at school, being suspended once, and completing community service as ordered by the criminal court. Reporting that she and Father have had a good relationship, she denied she was making up allegations of sexual abuse to get back at her parents for not letting her go out with friends. In addition, she reported never telling Mother about Father's sexual comment until after the police were contacted.
Two of Rubisela's siblings, Renau and Yesenia, were interviewed on August 10, 1999. Renau told the investigator that Rubisela was lying about the allegations, that he and brothers Gustavo and Jorge slept in the living room and heard nothing. He denied that Father sexually molested any of the siblings. Moreover, he denied any physical abuse and reported that Father and Rubisela had a "good relationship."
Yesenia also denied any sexual molestation of herself or any sibling by Father. Rubisela told her and Mother after the detention that Rubisela saw Father standing over her on several occasions and that, when Rubisela would discover him and would ask what he was doing, he would just walk away. Yesenia has not awakened at night to find Father standing over either her or Rubisela. Yesenia reported that Rubisela "gets into a lot of trouble at school and at home" and argues with Mother about not wanting to do her chores.
The Department stated that Rubisela admitted to behavior problems and appeared to recognize her negative behavior, which were "at a stage where the Minor can get help in dealing with her own issues." In addition, Rubisela wanted to *765 return home to her mother but had reservations because Mother does not believe her.
The medical examination of Rubisela conducted on June 21, 1999, revealed that her hymen was attenuated at 7 and 5 o'clock.[7] The report also contained the following history of the incident: "he said `suck me here'was facing child the end of where she was sleeping. Her shorts were down to her thighs, undies were up. He asked her to suck him. Asked her if she swas scared and she said yes. Asked for her forgiveness. Child stated mom told her to wear jeans and a belt to bed, to sleep close to her sister when she went to work @ night."
Rubisela's foster mother reported that during a weekly visit with Mother and the siblings, the foster mother overheard Mother accusing Rubisela of "making up the allegations because of her past behavior." Foster mother reminded Mother of the court orders, and Mother then stopped the conversation. Rubisela was attending counseling.
In an addendum report filed August 17, 1999, the CSW (children's social worker) reported that Father was living with his brother, but in an apartment only three or four apartment complexes from the family's.
At the hearing on August 17, 1999, the juvenile court set the matter for adjudication on October 5, 1999, after the parties were unable to reach an agreement in mediation. Rubisela was to remain detained in shelter care, with her siblings released to Mother. Rubisela was not transported to court on October 5, so the matter was continued to October 25. Visits with Rubisela were to be with her consent.

Adjudication hearing
The adjudication hearing was to begin October 25, 1999, but was continued to November 22, 1999, because the court was engaged in another trial. Prior to that hearing, Rubisela's therapist wrote a letter disclosing to the Department the Minor's "idea of committing suicide in case she would be sent home by Court. Minor stated that she is afraid and does not want to go back to her home. Minor disclosed that there were more than one incident of molestation. Minor disclosed [she had] been molested by her father on `more than five opportunities and less than ten.' Minor seems to be genuinely concerned about her reunification with family. Minor stated that she could not feel safe with her family." The letter was delivered the day of the hearing. At the October 25 hearing, Rubisela's counsel announced that Rubisela was "adamant" she wanted to remain in foster placement and not return home. She was afraid of her mother because "she feels that she will not be protected, and that he can abuse her again."
Rubisela's therapist, Irma Seilicovich, was an intern working under licensed therapists. She had seen Rubisela on a weekly basis since July 1999. The child told her that she had been molested by Father the night before reporting it at school. During the night, Rubisela found herself with her pants down, woke up and fell to the floor while trying to run away. She was awakened when Father touched her and asked for oral sex. In the morning, crying, she disclosed what had happened both to her older brother and to her sister and then at school. Rubisela repeated the statement about the incident in a consistent way on several occasions.
Sometime after the last court date, the minor revealed other incidents involving sexual misconduct with her father, i.e., she was touched on her breast area, vaginal *766 area, and on her buttocks and legs between five and 10 times.[8] He would touch the Minor's skin to skin at night while Mother and Yesenia were sleeping in the same room.[9] On the final time, Father exposed his genital area and asked for oral sex, and she "couldn't take it anymore,"[10] The therapist believed Rubisela was telling the truth; she "has been consistent, and she seemed to be very depressed and afraid to go back to her house. I don't see her as a rebellious teenager. She seems very shameful and very guilty about being the one who is speaking up about this situation."[11] In addition, Rubisela was afraid to return home, to the point where she started to have suicidal ideations.[12] The therapist did not think it would be appropriate to return her home at that time. Further, she opined that the minor waited to tell her about the other incidents both because it was difficult to discuss the details of the sexual acts and also because, until confronted with the idea of going back home, she was trying to protect her parents by not disclosing the full range of molestation.
When the therapist talked to Mother about the situation, Mother said she had been working that night so had not seen anything "so she needs to have proof about what's happened."[13] Mother did not appear to be afraid of Father. The minor had told her therapist she did not tell her mother about the touchings because "she was afraid of her mother." Specifically, she was afraid her mother might punish her, probably physically. The minor disclosed she had been physically punished by Mother and physically abused by both Mother and Father. Mother told the therapist that Gustavo had been punished physically for stealing money by pricking his fingertips with a needle.[14]
Yesenia, whom the therapist also saw as a patient, did not report abuse by her Mother or Father. Yesenia verified that *767 Rubisela was crying when she told Yesenia about the incident with Father.
Rubisela testified on her birthday. Her counsel, noting she had been in tears the day before during the therapist's testimony, asked to have her testimony in chambers, which was granted over Father's objection. The incident came to the attention of the authorities when Rubisela talked to a friend, who went with her to a teacher, who called a counselor. The counselor called an emergency social worker, who came to the school and interviewed the minor.[15] After the interview at school, the social worker called the police and Rubisela was taken to the police station and then to a foster home, where she has lived since.
She described the living arrangements, with her older brothers sleeping in the living room and her youngest brother, along with her sister and parents, in the bedroom. She and her sister slept on the floor, while Marvin slept in the bed with her parents about three feet away.[16] Rubisela was wearing underpants, Lycra shorts, and jean shorts with a zipper and a button; she testified she "always used to sleep in tight clothing" because she "liked it." She heard some "tool" noise in the middle of the night and woke up. She was going toward the bathroom when she tripped because her jean shorts were down to her knees; she did not remember unbuttoning or unzipping them. She tried to kick at her father before he spoke to her. Her dad ran towards her to kind of pick her up and said "Chupame aqui" which was interpreted as "Suck me here."[17] Rubisela took that to mean he wanted her to suck his penis. Seared, she was crying with teary eyes, but not aloud, and told him "calmate" (Stop) in what the court described as "somewhat loud and quite forceful in tone." Rubisela tried to yell "Calmate" at her father so Yesenia would wake up, but her sister did not wake up.[18] While it was happening, she told Father that she was his daughter and he should not treat her that way. Father apologized and asked for her forgiveness. She went back to sleep about half an hour later.
According to Rubisela, the year she was 13 her father had touched her more than five and less than 10 times before. Each time he approached her from the back while she was laying on the floor asleep; she was never facing him. By the third time, he touched her breasts, groin part or vagina, and butt. He touched her vagina with his fingers at night while she was wearing clothes; others in the bedroom were asleep. It was dark and she did not know if he was dressed or not. The fourth time involved the same touching; the fifth time he did not touch her breasts. She thinks he touched her under and over the *768 jeans, both only at the time of the final incident did her jeans come down to her ankles. The final time was the one she reported at school. Her mother was home the next morning when Rubisela and her brother left for school, but she never told her mother about the touchings because "I didn't trust her that much."' She was not afraid of her mother, but was afraid of Father and that he might hurt her.[19] She told the therapist she was afraid of her mother. The first person she told was the friend who told her to tell the teacher. She also told her foster mother. The morning of the final incident, crying, she told Yesenia and Renau.[20] However, she did not tell the police about the other touchings because she "was scared." It took her a while to feel comfortable with her therapist and reveal everything to her after disclosing it to her foster mother.
Rubisela admitted having trouble in school, such as fighting and bad grades. Her parents got mad at her for both. In turn, she got upset because her parents were mad at her. She was also angry because they would never let her go out with friends and they threatened to send her to Mexico. She was also upset when her father embarrassed her in front of the apartment manager and the man who kissed her. However, she denied lying in court or trying to get back at them or hurt either of them. She conceded that neither parent had physically abused her, aside from her father's touchings. She also admitted that her mother and then her father took her to court; Father also went with her to school, during the middle of the time he was touching her.
Mother testified that on June 17, 1999, she was working in an envelope factory about half an hour from her home. She arrived home about 1 a.m. They had lived in that home since March 1999 and before that lived in a three-bedroom home on the same street. At the previous home, all the children slept in one bedroom, the girls sharing a bed and the boys sharing a bed.[21] Everyone was asleep when Mother arrived home the night of the alleged incident. Rubisela and Yesenia were on the floor in their parents' bedroom, where they always sleep. Rubisela and Yesenia were sleeping about an inch apart, with Rubisela in between Yesenia and the closet. Father was in the room in bed asleep with Marvin. Sons Renau and Gustavo were asleep in the living room. No one woke up when Mother turned on the lights, which she did to check on all of them, including her husband. From November 1998 until February 1999, Rubisela was never awake when Mother came home. None of the children complained about any problems occurring at home while Mother was at work.
When Mother woke Rubisela the next morning, her daughter acted no differently than on most mornings. She did not ask to talk to Mother privately, nor did she appear to be crying. According to Mother, Rubisela was laughing that morning. Prior to that day, Rubisela never told Mother that Father had touched her. Nor on that day did she tell Mother that Father *769 had asked for oral sex. When asked if Mother thought her daughter would feel comfortable telling Mother if Father had said "Chupame aqui," Mother replied "I don't know." When asked if Rubisela is honest or dishonest, Mother also answered, "I don't know."[22] Again asked if she believes Rubisela, Mother first replied "yes" twice and then "I don't know."
The Pretrial resolution conference report of dependency investigator Agustin Martinez was admitted in evidence. According to Martinez's testimony, Rubisela was sad and serious when interviewed at the foster home without her parents present. Rubisela said her relationship with her parents was good and denied being physically abused by them. Rubisela told him she tripped on a pillow on the way to the bathroom and fell. She told him she had not told her mother about the incident because it was early in the morning and the minor left in a rush. The minor did not tell him she had ever asked Mother to protect her from Father or that she was afraid of Father. He never clarified inconsistencies with the information Rubisela had given Emergency Response worker Grissell Jover.
Further, Rubisela said that incident was the only time her father touched her inappropriately. When the allegations of other touchings came to light, Martinez tried to talk to her about them, but she did not want to discuss the allegations with him. She said she felt uncomfortable and had told the truth to the therapist. She did remember that she was sleeping with tight jeans on that night, something she initially forgot to tell the investigator. In his experience, it is not unusual for a child to disclose more details later on in the therapeutic process. There can be a variance in details, especially in a traumatic situation such as sexual abuse by a father.
Moreover, Rubisela confirmed she had conflicts with her parents and thought they were too strict. Specifically, they would not let her leave the apartment. He did not uncover any reason to think the accusations might be lies to get back at her parents. Rather, he thought she was telling the truth. Having interviewed hundreds of minors, he based this belief on her affect, her summary and that she did not exaggerate or make up a lot of stuff, and she was consistent.
When the investigator interviewed Mother, which was before he talked to Rubisela, Mother was cooperative. She told him they had had some problems with Rubisela, who had been expelled for fighting, but that she was not incorrigible. The children seemed well taken care of. Based on the fact that the siblings were staying with Mother and Father was not in the home, he did not think the other children were at risk.
Father did not want to meet face to face with the investigator, saying he was too busy, but did talk to him over the phone. Father confirmed some of the problems mentioned by Mother during her interview. The investigator's interviews with Yesenia, Renau, and Gustavo revealed no evidence of physical abuse of those children. Yesenia said she had not woken up the night of the alleged incident. Moreover, Yesenia told him that after the children were detained, Rubisela told Yesenia that she had woken up during the night and found Father standing over her several times.
The investigator found out about the letter from the therapist, alleging other incidents, in court. He had not heard about these allegations from the foster mother.
Father called Yesenia and Renau as witnesses and testified himself. Yesenia, 11 years old at the hearing, testified that before the detention she slept in the bedroom with her parents, sister, and their *770 little brother.[23] She has always slept with Rubisela. There was never a time when she woke up in' the middle of the night and Father was on her bed, or lying on the floor next to her, or touching Rubisela. Neither did Rubisela ever tell her that had happened. There were times her parents were "only a little bit" upset with her sister, but Yesenia never saw Father near the bed during that time. Neither had she seen Father hit Mother or Rubisela or hear Rubisela say she was afraid of either parent, that she wished Mother would not go out and work at night, or that Mother could not keep her safe.
Renau, 12 at the time of the hearing, testified he now sleeps in the bedroom with his brother and Yesenia. But when Father was living in the home, Renau slept in the living room with his brothers. In the old apartment, from which they moved in about March, he never saw his father in the children's bedroom, nor did he ever wake up and see his father standing over the bed of his sisters. Rubisela never told him Father had touched her or said anything to her in the middle of the night.[24] On the way to school the morning of the alleged incident, Rubisela told him that when she woke up, Father was on top of her. Renau had not heard anything the night before, nor had he ever seen Father hit Rubisela. While Rubisela got in trouble at school, he told the social worker that she had a good relationship with Father. Renau never saw Rubisela argue or talk back to Mother. Nor did she ever tell him she was afraid of either parent, did not like her mother working at night, did not feel safe, or that she thought Mother could not keep the children safe.
Father testified and denied the allegation, stating he did not even get up that night. He had not laid down next to Rubisela, nor did he ever touch her in a sexual way[25] or say "Chupame aqui" to her. Neither did he ever force sex on his wife. Father first found out about the charges When his wife called him at work and said they had taken all the children from the house and were investigating something "supposedly that I had committed with Rubisela." He believes Rubisela is lying about the charges.
The family had moved in March because his brother, with whom they had shared the previous rent, was getting his own apartment and Father could not pay the rent himself. At the previous apartment, Rubisela and Yesenia slept in the parental bedroom only when Rubisela had a problem with a young boy through the window of the apartment. Rubisela never objected that she did not want to sleep in the same bedroom with him.
Father testified that he spoke to investigator Martinez only once. Because Father did not have car and had to take the bus, he agreed to talk over the phone rather than come in that very day. He did not ask if he could come in the next day. Father told the investigator he was having some problems with Rubisela.
On the night in question, Father's final conversation with Rubisela was to ask her to take care of the younger children because he had a headache. She said no because she wanted to go outside. He then asked if she could take the children outside with her, and she did. They were outside for about two hours, came in around 7 p.m., and then were supposed to go to bed. Father testified that he went to *771 bed before Rubisela, when the children were still outside. He then explained that he got up when the children were coming in at 7 a.m. When he woke up in the morning to leave at 6 a.m., Mother was home; he had not talked to her after she came home from work.

Adjudication and disposition
On December 14, 1999, finding this a "difficult case," "maybe not a very close case, but ... not a slam-dunk case by any means," the juvenile court made findings sustaining the petition as amended as to section 300, subdivisions ((b), (c), (d), and (j). The amendment was to delete the language regarding attempted sexual intercourse, and to add language that there was sexual abuse on multiple occasions, including asking the child to orally copulate Father. The court further sustained the language that Mother failed to take action to protect Rubisela. The allegation as to subdivision (i) was dismissed.
In sum, the court was troubled by Yesenia's not waking up and, despite some inconsistencies in Rubisela's testimony, "thought that Rubisela's affect throughout the case was consistent with her testimony. She never seemed to me to be acting. She always struck me as being sincere. On occasions, I observed her very gently, slightly shaking her head from side to side when testimony as given that was contrary to herself. It didn't appear to me that she knew that I was observing her. She wasn't acting in a way that seemed as I've seen on many occasions to try to get attention. It seemed to reflect a sincere act on her part." Furthermore, the court was troubled by Mother's testimony that she sneaked in at night to check whether something was wrong, and then to downplay that statement saying it was because of what she had seen on television.
In addition, the court remarked it "couldn't tell what to think about when the mother said softly and with emotion at one point that she believed Rubisela. I don't know if there was something missing in the translation, but it struck me that that might have been a moment of authenticity." As for his evaluation of Father's testimony, while the court found it "credible," the court found it "somewhat striking" though not determinative that when asked if he believed Rubisela was lying "[Father] was unable to answer that question without pausing for a considerable period of time before saying yes, which seemed to indicate that it was difficult for him to do so."
As for Mother, the court could not have sustained language that Mother knew the activities was taking place but thought "she had reason to, and I think she suspected something was going on, and ... for fear of what it meant, looked the other way and didn't want to see what was right in front of her and what she was worried about when she was coming home at night to see if anything was wrong."
Rubisela's care, custody and control was placed under supervision of the Department for suitable placement. All the other children were placed with Mother, conditioned upon Father's not residing in the home. The court ordered Father, Mother, and Rubisela to be in sexual abuse counseling with conjoint counseling for Rubisela and both of her parents. Father was to be able to visit the family during the day for the holidays, but not with Rubisela present.
Further, the court ordered Mother could have unmonitored visits including overnights and holiday visits with Rubisela, but Father was not to be present. Father could have day visits with the siblings in the family home and Mother may monitor those visits so long as Rubisela was not present during those visits.[26] Moreover, Father could have monitored visits with Rubisela in neutral setting, with a Department-approved monitor, but only if Rubisela agreed and unless her therapist recommended such visits would he a risk to the minor. Father appealed from the December 14, 1999, order sustaining the petition and from the disposition.

*772 CONTENTIONS ON APPEAL
Father contends: 1. There is insufficient evidentiary support for the juvenile court's conclusion that minor Rubisela had been abused. 2. The evidence presented at the jurisdictional hearing was insufficient to support a finding that the minors are described by section 300, subdivisions (b), (c), (d) and (j). 3. Clear and convincing evidence did not support the continued removal of Father from the family home and denial of custody of his children.
The Department concedes in its brief that subdivision (b) does not fit appellant's conduct, but does fit Mother's, and that since she has not appealed, the finding as to subdivision (b) should be affirmed as to her.

DISCUSSION

1. Substantial evidence supports the juvenile court's finding of abuse.
"[T]he appropriate standard of review is for this court to determine whether the trial court's order was supported by substantial evidence. Substantial evidence is evidence that is `reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings. (In re Angelia P. (1981) 28 Cal.3d 908, 924, 171 Cal.Rptr. 637, 623 P.2d 198.) It is axiomatic that an appellate court defers to the trier of fact on such determinations, and has no power to judge the effect or value of, or to weigh the evidence; to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence. We review a cold record and, unlike a trial court, have no opportunity to observe the appearance and demeanor of the witnesses. [Citation] `Issues of fact and credibility are questions for the trial court.' [Citations.] It is not an appellate court's function, in short, to redetermine the facts. [Citation.]" (In re Sheila B. (1993) 19 Cal.App.4th 187, 199-200, 23 Cal.Rptr.2d 482; accord Elijah R. v. Superior Court (1998) 66 Cal.App.4th 965, 969, 78 Cal.Rptr.2d 311.)
Father claims that the inconsistencies in Rubisela's retelling of the incident to various investigators, as well as the fact her sister never awoke during the confrontation, compels a conclusion that her testimony and the evidence as a whole does not support a finding that Father ever touched Rubisela in a sexual way or proposed oral sex. We disagree.
As Father concedes, the testimony of a single witness can be sufficient to uphold a judgment. (In re Sheila B., supra, 19 Cal.App.4th 187, 200, 23 Cal. Rptr.2d 482.) The juvenile court observed Rubisela and her parents. As is often the case, her testimony and the various reports given to investigators contained inconsistencies. Nevertheless, although the exact circumstances surrounding the event may have differed in the retelling, the essence of the offense, that her father asked her to orally copulate him in the middle of the night, did not change. Only after months of therapy did the prior sexual acts become known; but such belated revelation is understandable and not inherently incredible. Moreover, Mother's testimony that she sneaked into the house to see if her husband was doing anything wrong was certainly disturbing.
The juvenile court especially noted the demeanor of Rubisela and her parents in court. Mother at one point testified Rubisela was telling the truth, and Father had a difficult time when he testified the minor was lying. Rubisela appeared to shake her head when testimony against hers was presented. Substantial evidence supports the juvenile court's determination that Father touched Rubisela in a sexual way on several occasions and that he proposed oral sex to her.

2. The evidence presented at the jurisdictional hearing supports a finding that the minors are described by section 300, subdivisions (c), (d), and (j) as to Father.
Father first again argues that there is insufficient evidence to support *773 the finding of sexual abuse of Rubisela. As we have explained above, substantial evidence in the record as a whole supports the juvenile court's finding of sexual abuse. Even assuming such evidence of sexual abuse of Rubisela, Father next argues the absence of evidence to indicate the risk of future harm to the siblings under any of the indicated subdivisions of section 300.

Subdivision (d)
A child may be found dependent under section 300, subdivision (d), if the "child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent or guardian or a member of his or her household, or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent ... knew or reasonably should have known that the child was in danger of sexual abuse." As explained above, the record supports a finding that Rubisela falls within this subdivision. Father sexually abused the child, and Mother reasonably should have known she was in danger and failed to protect her.
This is far different than the circumstances in In re James B. (1986) 184 Cal. App.3d 524, 530, 229 Cal.Rptr. 206, where there was one incident of sexual molestation of a two-year-old girl by her seven-year-old brother when bathing together, followed by their mother's prompt reaction to the situation. Under former subdivision (d), the James B. court stated, 184 Cal. App.3d 524, 529, 229 Cal.Rptr. 206: "There must be some reason to believe the acts may continue in the future. (In re Jennifer P. [ (1985) ] 174 Cal.App.3d [322,] 326 [219 Cal.Rptr. 909] [molestations occurred at former husband's home during court-ordered visitation and mother took swift action once the incidents were discovered].)" As to Rubisela, the court was justified in implicitly determining that Rubisela had been placed at risk and continued to be at risk for future misbehavior by Father and lack of protection by Mother.

Subdivision (b)
A child may be adjudged dependent and within the jurisdiction of the juvenile court under section 300, subdivision (b), if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child...." The Department concedes that Father's conduct does not place the children within this subdivision but that there is evidence the conduct of Mother, who did not appeal, in failing to protect Rubisela places her and her siblings in danger. We shall therefore reverse the subdivision (b) finding as to Father.

Subdivision (c)
A child may be found dependent under section 300, subdivision (c), where the "child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent...." Again, given the conduct of Father toward Rubisela and her later suicidal ideation, the juvenile court is amply justified in finding that Rubisela falls within this section.

Subdivision (j)
Section 300, subdivision (j), provides that a child who comes within the following description is within the jurisdiction of the juvenile court, which may adjudge that person to be a dependent child: "The child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i) and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions. The court shall consider the circumstances surrounding the abuse or neglect of the sibling, *774 the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other facts the court considers probative in determining whether there is a substantial risk to the child...." (See In re Lucero L. (2000) 22 Cal.4th 1227, 1237, fn. 4, 96 Cal.Rptr.2d 56, 998 P.2d 1019 and accompanying text.)
As we have discussed above, substantial evidence supports the court's findings that Rubisela fell within subdivisions (c) and (d) and, because of her mother's neglect, subdivision (b): Thus, pursuant to subdivision (j), "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i) ... "The remaining question is whether the Department has demonstrated the second prong of subdivision (j), i.e., that "there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."
The circumstances surrounding the abuse of Rubisela support a finding under subdivision (j) as to her sister. It is reasonable for the juvenile court to determine that in Rubisela's absence, Father's sexual offenses were likely to focus on his only other daughter., (See In re Joshua J. (1995) 39 Cal.App.4th 984, 994-995, 46 Cal. Rptr.2d 491 [substantial risk of abuse to second brother where first had been subject to serious sexual abuse and father's mental condition had not changed].)
The question of whether subdivision (j) can be upheld as to the sons is more problematic. Sexual abuse of one's sibling can support a trial court's determination that there is substantial risk to the remaining siblings. (In re Jason L (1990) 222 Cal.App.3d 1206, 1215, 272 Cal.Rptr. 316; In re Carmen O. (1994) 28 Cal. App.4th 908, 33 Cal.Rptr.2d 848 [affirming jurisdictional order under (j) as to brother whose sister was molested, without directly addressing the issue; but see In re Amy M. (1991) 232 Cal.App.3d 849, 865, 283 Cal.Rptr. 788, where the Department conceded that the juvenile court had no jurisdiction under section 300, subdivision (j), over a brother whose sister had been molested since "that subdivision does not include allegations of emotional harm based on sibling abuse.")
In reviewing the legislative history of subdivision (j), the Jason L. court noted, 222 Cal.App.3d 1206, 1215, 272 Cal.Rptr. 316: "Prior to 1989, Welfare and Institutions Code section 300 did not specify sibling abuse as a ground for declaring a child a dependent of the juvenile court. Nonetheless, case law upheld petitions seeking to declare children dependents on this basis. (In re Dorothy I. (1984) 162 Cal. App.3d 1154, 1157-1158 [209 Cal.Rptr. 5]; In re Michael S., supra, 127 Cal.App.3d 348 [179 Cal.Rptr. 546] [overruled on other grounds in In re Kristin H. (1996) 46 Cal.App.4th 1635, 1667, 54 Cal.Rptr.2d 722]; In re Edward C. (1981) 126 Cal. App.3d 193, 203 [178 Cal.Rptr. 694]; In re Jeannie Q. (1973) 32 Cal.App.3d 288, 304 [107 Cal.Rptr. 646].) `Sibling petitions have been accepted for many years in this jurisdiction and others. The state may intervene to protect a minor when the minor's sibling has been mistreated....' (In re Dorothy I., supra, 162 Cal.App.3d at p. 1157 [209 Cal.Rptr. 5].) [¶] Effective January 1, 1989, the Legislature added subdivision (j) to section 300. (Stats.1987, ch. 1485, §§ 4, 4.5, 51, & 52, pp. 5603-5609, 5644.)"
We note, however, that the father's contact with the minor son was suspicious in Jason L., while there is no evidence of this type of conduct in the case at bench: "The evidence in this case also supports the judgment. In addition to the proof of appellant's sexual molestation of Brandi, there was evidence appellant had one, possibly two, previous adult homosexual relationships, shared a bedroom with Jason, showered with him at least twice when Jason was ten years old, and initially denied the joint showers occurred. Mrs. Wardrop testified Jason felt responsible for appellant, and was very protective of him. As a result, she was concerned Jason might not be entirely truthful about *775 his relationship with appellant." (In re Jason L., supra, 222 Cal.App.3d 1206, 1217, 272 Cal.Rptr. 316.)
We do not discount the real possibility that brothers of molested sisters can be molested (see In re Mark C. (1992) 7 Cal.App.4th 433, 439, 8 Cal.Rptr.2d 856 [sister and brother both molested; as alternative ground, court did not err in excluding character testimony as to subdivision (j) regarding brother]) or in other ways harmed by the fact of the molestation within the family. Brothers can be harmed by the knowledge that a parent has so abused the trust of their sister. They can even be harmed by the denial of the perpetrator, the spouse's acquiescence in the denial, or their parents' efforts to embrace them in a web of denial.
Addressing a different issue, our Supreme Court in In re Kieshia E. (1993) 6 Cal.4th 68, 76-77, 23 Cal.Rptr.2d 775, 859 P.2d 1290, observed the inherent and serious harm to children who have suffered sexual abuse by a parent: "Of course, sexual or other serious physical abuse of a child by an adult constitutes a fundamental betrayal of the appropriate relationship between the generations. We recently observed in another context that child molestation is among those acts `so inherently harmful that the intent to commit the act and the intent to harm are one and the same....' (J.C. Penney Casualty Ins. Co. v. M.K. (1991) 52 Cal.3d 1009, 1026 [278 Cal.Rptr. 64, 804 P.2d 689].) When a parent abuses his or her own child, or permits such abuse to occur in the household, the parent also abandons and contravenes the parental role. Such misparenting is among the specific compelling circumstances which may justify state intervention, including an interruption of parental custody. (See § 300, subds. (d), (e), (j).)" But in the case at bench, while such a showing is possible, there has been no demonstration by the Department that "there is a substantial risk [to the brothers] that [they] will be abused or neglected, as defined in ... [the applicable] subdivisions" (Compare, e.g., In re Edward C. (1981) 126 Cal.App.3d 193, 198-9, 178 Cal. Rptr. 694, where the brothers had witnessed their sister's severe beatings and had been subjects of less harsh physical discipline by their father].) We must therefore reverse the jurisdictional order as to the brothers and remand for appropriate changes in the dispositional order.

3. Clear and convincing evidence supports the continued removal of Father from the family home and denial of custody of his children.
Finally, Father contends that he should be allowed to return to the family home and regain custody of his children. We disagree. The younger daughter is still in the family home. Given Father's repeated molestation of Rubisela, the juvenile court did not abuse its discretion in ordering Father to remain outside of the family home.

DISPOSITION
The order of December 14,1999, is modified so as to delete a finding that as to Father the children are dependent pursuant to Welfare and Institutions Code section 300, subdivision (b). Jurisdiction is terminated as to Renau, Gustavo, Jorge, and Marvin. In all other respects, the adjudication and disposition orders are affirmed.
BOREN, P.J., and NOTT, J., concur.
NOTES
[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

The children and their ages on June 17, 1999, were Rubisela, 13; Renau, 11; Yesenia, 9; Gustavo, 8; Jorge, 4; and Marvin, 2. Rubisela and Yesenia are female. According to an arrest report that is part of the record on appeal, Rubisela was 4'10" and 90 pounds.
[2] Mother explained that Rubisela had gotten into two fights in school and once was speaking to a boy from her bedroom window but denied it when asked. Mother further stated she thought her daughter "has had boyfriends in the past."
[3] Mother admitted in her testimony that she told the worker she "sneaked" into the house to see if her husband was doing anything wrong. According to Mother, she had seen a lot of television programs where fathers abuse their children "but I don't have any mistrust about him." Then she changed her testimony to state she was checking to see that the children were covered so they would not be cold. Moreover, Mother testified that if the worker said Mother made the statement, the worker was lying,
[4] Rubisela's counsel had discussed options with his client, who indicated she wished to remain in foster care rather than be released to her parents or a relative. According to counsel, the minor indicated that "she doesn't feel as though she would be safe in relative care. ..." However, she wanted the court to know that she did not want to contribute to her family being split apart and was "very upset at the prospect of her father moving out."
[5] The report stated that neither parent had a criminal arrest record in California.
[6] At the time, brothers Renau, Gustavo and Jorge slept in the living room while Rubisela and Yesenia slept in the same bedroom with their parents and little brother Marvin.
[7] Rubisela told the investigator she had never had sexual intercourse and no one, including her father, had penetrated her. When asked if she ever hurt herself on the vagina, she reported that in October 1998 she was riding her bike and crashed and hit her private part; the reported telling the same thing to the emergency response children's worker when asked about the medical results. A public health nurse reported that trauma to the hymen can possibly be caused by a bicycle accident or by a fall.
[8] Her foster mother observed that Rubisela had been agitated and depressed, crying and mentioning suicide. When the foster mother inquired, Rubisela told her about the additional incidents with her father. The foster mother then told the therapist. Rubisela had disclosed her depression from the beginning, part of which was from being separated from her siblings, whom she missed a lot.
[9] Rubisela was in the courtroom during the therapist's testimony and needed a break at one point. Her counsel stated "It is very emotional for my client." After the therapist's testimony, Rubisela was to be the next witness. The court noted that it was late in the day and "[i]t's been a hard day for her. I'm not going to put her through testimony at this time." During argument to the court, counsel stated that the minor "basically cried throughout" the therapist's testimony. During her own testimony the following day, Rubisela corroborated the therapist's testimony about what the minor had told the therapist.
[10] During her own testimony, Rubisela denied that she had seen his private parts that night or any other night. She denied telling the police or anyone else that she had.
[11] The therapist was aware that Rubisela was involved in some fights prior to being placed in foster care. She was not aware that the minor had to go to juvenile criminal court for some of those fights.
[12] According to the therapist, Rubisela was both very protective of her parents and afraid of them. The child was afraid that her siblings would also be molested. Even when her father was outside the house, she thought he presented a risk to her. However, she had an expectation that Mother would protect the other children, at least while Father was not living at the house.
[13] Mother's counsel requested the Department to provide another referral to Mother for therapy.
[14] The therapist denied that Mother told her Gustavo's finger was pricked by a doctor to get blood because he was being treated for anemia and that Mother then told him it was because he stole. She called the Department about the matter and was told CSW was going to investigate.

Mother testified that Gustavo's fingers were pricked by a doctor because he had anemia and needed a blood sample. However, according to Mother, she had told the therapist not that she had taken Gustavo to the doctor, but that she told Gustavo that taking blood was a punishment because he had taken some money.
[15] She did not remember telling the emergency worker that her father's arm around her neck is what woke her up, nor did she remember that happening. Neither did she remember telling the worker that she was wearing only underwear and it was around her knees when she tried to get up or that she threatened to tell the police and that her father left only after that threat. Further, she denied telling the police her father was under investigation for trying to have sex with her sister. Nor did she remember telling the police that Father was already standing over her when she woke up. She told the police it was about 1 a.m. but does not remember telling an investigator that she knew the time because of a clock radio in the room.
[16] Before moving to that apartment in April 1999, she had her own bedroom with her siblings. After she talked to some guy though the window, kissed him, and then denied it happened, her father moved her into the parental room when she was 12. Since she was lonely, she asked Yesenia to join her, and her sister started sleeping in the room with her. Father did not touch her until after they moved. During the whole time she was 13, Rubisela testified she slept with her parents in their room.
[17] She felt him leaning or kneeling towards her, like air moving by.
[18] Rubisela testified that Yesenia is a heavy sleeper. Although Mother testified that Yesenia is a light sleeper, neither Yesenia nor any of the other children woke up when Mother turned on the lights in the middle of the night.
[19] On the other hand, she had had a good relationship with her father in the past. Now that this has happened, she is not able to trust him enough to be alone with him "not even for one minute." Her father had already left for work when she got up to go to school after the incident.
[20] According to Rubisela, she told her brother on their way to school and Renau said "I can't believe this." She told her sister at the house before going to school, and Yesenia "was just like sad."
[21] At one point, in about February 1999, she made Rubisela sleep on the floor in the parental bedroom in their previous home. This was because Rubisela was seeing some boy and talking to him through the window at midnight. Mother explained the situation to Rubisela, who did not object to changing rooms or complain that Father was unfair.

Mother testified that she had problems with Rubisela's following house rules. Rubisela was never out after curfew; she was not allowed out.
[22] Rubisela had lied to her about receiving a citation to go to court. She told Mother she had not received any citation.
[23] In the apartment before that, she initially slept in a bedroom with her brothers and sister but later, with Rubisela, moved into her parents' room. Renau corroborated the sleeping arrangements in both apartments.
[24] On cross-examination, he admitted telling investigator Martinez that Rubisela had told him that her father was on top of her that night and she was screaming. His sister was crying when she told him that.
[25] Father's initial reply to the question "Was there ever a time when you touched Rubisela in a sexual way?" was "I don't remember having done it." When she was very young, he cuddled with her.
[26] The Department objected to Mother's monitoring Father's visits.