Filed 10/2/13  In re D.Z. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re D. Z., et al., Persons Coming Under the Juvenile Court Law. | B243097 |
| | (Los Angeles County Super. Ct. No. CK89502) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Appellant.<br><br>        v.<br><br>JUAN Z.,<br><br>        Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Marilyn Kading Martinez, Commissioner.  Affirmed.

Andrew F. F. Toscano, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Kimberly A. Roura, Deputy County Counsel for Plaintiff and Appellant.

Juan Z. (father) appeals from a judgment of the juvenile court, challenging the adjudication findings in relation to his own children after he sexually abused his stepdaughter on two occasions and physically abused her on one occasion. Department of Children and Family Services (DCFS or respondent) contends that the appeal is moot and has filed a cross-appeal. We address father's contentions but find them to be without merit, and as such we affirm the judgment. We dismiss respondent's cross-appeal as moot.

## BACKGROUND

**Detention and petition**

The juvenile court ordered father's children D. (born June 2005) and Juan Jr. (born July 2009) detained on August 29, 2011, along with their half-siblings, father's stepdaughters, Adriana (born March 1994), J. (born December 1995), and A. (born September 2001). On October 13, 2011, the court ordered the detention of father's youngest child Di., born after the other children were detained. The children were released to mother and remained in her home.

DCFS filed petitions to bring the minors within the jurisdiction of the juvenile court, pursuant to Welfare and Institutions Code section 300.[1] After prior petitions were dismissed, a first amended petition (petition) alleged that father had sexually abused J. in 2009, by removing her clothes and placing her on a hotel bed (the San Diego incident), and again in April 2011, by climbing on her back, placing his penis on her buttocks, and masturbating (the second incident); and that father had physically abused J. in June 2011, by slapping her, resulting in a laceration and bleeding (the slapping incident). The petition also alleged that J.'s mother Nadia C. (mother) failed to adequately protect the child; that the sexual abuse and failure to protect "place[d] the child and the child's siblings . . . at risk of physical and emotional harm, sexual abuse and failure to protect"; and that the abuse and failure to protect "create[d] a detrimental home environment and

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

2

place[d] the child and the child's siblings . . . at risk of physical harm, physical abuse and failure to protect."

The adjudication hearing was held on May 30, 2012, and the disposition order was entered the same day. The juvenile court made some factual modifications to the petition, dismissed the allegations regarding Adriana, found true the 2009 and 2011 sexual abuse incidents alleged in counts b-1, d-1, and j-1, as well as the slapping incident alleged in counts b-3 and j-3, and declared J. a dependent of the court.[2] The court found by clear and convincing evidence that a substantial danger existed to the children with no reasonable means to protect them without removing them from father's custody, despite reasonable efforts to protect them. The court dismissed the siblings from all counts except j-1 and j-3, thus declaring them dependents of the juvenile court only under section 300, subdivision (j). Adriana had been dismissed from the proceedings when she turned 18 years old. Father filed a timely notice of appeal.[3]

No testimony was presented at the combined jurisdiction and disposition hearing, rather the issues were submitted on the documentary evidence admitted by the juvenile court.[4]

---

[2] J. recanted her accusations after father was arrested, an immigration hold was placed on him, and J. was told she would have to testify. Criminal charges were dropped after J. recanted and father was later released. The juvenile court disbelieved J.'s recantation.

[3] Four months later, the juvenile court terminated jurisdiction due to the entry of a family law order granting legal and physical custody of the children to mother.

[4] Seven exhibits were admitted into evidence without objection: (1) jurisdiction report dated December 8, 2011; (1A) detention report dated October 12, 2011; (1B) detention report dated August 29, 2011; (1C) summary of evaluation of J., August 26, 2011, Child Crisis Center Harbor-UCLA Medical Center; (1D) LASD incident report narrative; (1E) LASD incident report, URN 910159881399-444; (2) last minute report dated March 14, 2012; and (3) any report prepared on the trial date.

3

**The San Diego incident**

In 2009, as part of his job, father drove to San Diego and asked for J.'s company in order to use the carpool lane. J., who was 13 or 14 years old at the time, fell asleep in the car on the way, and when she awoke, she was naked on a bed in a hotel room. J. felt panic; she cried and screamed at father to take her home. Father looked nervous, said that he thought she liked him, and "Don't act like this is the first time." J. did not think he had sex with her. On the way home, father told J. that if she told her pregnant mother what happened it would upset mother and could cause a miscarriage, which would be J.'s fault. Father promised to leave J. alone if she did not tell mother, so J. said nothing. When J. revealed the abuse to her mother in July 2010, the incident was reported to the Sheriff's Department. The matter was not pursued due to a lack of evidence.

J. told a social worker that Adriana had confided to J. that father had touched Adriana's breast once when she accompanied him to San Diego. Adriana denied saying that father had touched her breast to the social worker, however Adriana told Detective Rudy Acevedo the preceding day that father had touched her breast under her shirt once in 2009. Adriana said she did not say anything before because she is the eldest sibling and supposed to be the strong one of the family and did not want to look weak. Adriana also denied she had ever observed father trying to touch any of her siblings inappropriately. Father denied the San Diego incident had occurred, but admitted touching Adriana's breast. Though he denied reaching under her shirt he explained that he disciplined her for acting up by grabbing and twisting her breast. He said he told mother about it and she still allowed him back into the home.

When J. reported the San Diego incident to mother, father left to live in Guatemala with another woman. He returned to live with the family four months later. Despite J.'s report and knowing that father had been accused in 2003 of raping a prostitute, mother pressured father to return and allowed him back into the home because she needed his financial support. Father's criminal history from 1998 through 2008 contained misdemeanor convictions of prostitution, theft, and battery. Arrests for corporal injury on a spouse, rape, sodomy, and forcible oral copulation were also noted.

4

Mother told the social worker that she was not sure she believed her daughter, as father was strict, and she thought J. might have been motivated by anger and rebellion.

**Second incident**

In April 2011, mother left J. alone with father for the first time since she reported the San Diego incident. Mother left J. and her sisters A. and D. at home asleep in their shared bedroom, and had taken the other children with her to visit an uncle in jail. D. and J. were in one bed and Aneyeli in another. J. was asleep on her stomach in her pajamas when father removed her blanket, got on top of her and placed his penis between the cheeks of her buttocks before ejaculating on her back. Father cleaned J.'s back with wipes. J. kept her eyes closed throughout the incident because she was afraid to open them and did not want to wake her sisters. When she heard father leave, J. sent her mother a message asking her to come home saying that "it was happening again."

Mother telephoned father as soon as she received J.'s message. Father started to go into the girls' bedroom while he was on the telephone with mother but J. screamed at him to get out, so he left for work. While on the telephone with father, mother heard J. scream in the background, "Get out of my room." J.'s screaming woke up A. and D. The girls remembered waking up to J.'s crying and screaming at father, but did not know what had happened.

J. did not shower for three days because she thought her mother was going to take her to the doctor and feared they would not believe her if she washed. J. thought her mother had retrieved the used wipes from the trash and stored them, but mother denied having the wipes or even knowing anything about them. Mother claimed J. reported only that father had touched her, but did not describe what he had done. Mother said she did not have J. medically examined because J. did not ask to see a doctor. She did not make a police report either because J. did not want to do so.

Detective Acevedo told father they had recovered the used wipes and had found his semen and the child's DNA on them. Father responded that J. knew he sometimes masturbated in the bathroom, and she must have taken the wipes out of the trash and wiped herself with them since she was out to get him. Semen was detected on J.'s

5

mattress, and when Detective Acevedo informed father of this, father said J. must have smeared the wipes there.[5]

**The slapping incident**

In June 2011, an argument erupted in the kitchen among mother, J., Adriana, and father in the presence of D. and Juan Jr. According to mother, J. and Adriana had been constantly arguing with father, being very disrespectful, cursing at him and calling him names. She believed the tension among them was the result of J.'s allegations, so mother confronted them. As a result, both girls cursed at father, who said, "If that is true then call the police, think about what you are doing, how it will affect your younger siblings." Mother said there was no slapping and the family decided to forget about everything and move forward.

J. said she was holding a kitchen knife during the argument, cursed at father, and acted as though she would stab him, but slapped him instead. Father slapped her back so hard that her nose bled. J. surmised that her nose bled because it had been pierced.

Adriana recalled that the argument began when mother confronted J. and father about something. Adriana heard her sister scream at father to the effect that he had done something. She did not remember seeing a knife. Father denied he had done whatever it was and asked J. whether she wanted to call the police. J. replied, "Okay, let's go call the police"; but the police were not called. Father then said to the younger children that all these lies would turn into a "big deal," that he would go to jail for something that was not true. He said they would grow up without a dad, and their mother would have to work hard to support them. Everyone agreed to "just forget about everything."

Mother and father did not ordinarily use corporal punishment to discipline the children, although mother spanked Juan Jr. occasionally with her hand. A. and D. showed no signs of abuse, reported none, and denied that anyone had ever touched them

---

[5] Mother denied that she and father had ever had sex in the children's room. Later, after J. recanted, when a psychologist told her that semen had been found on her mattress, J. claimed the mattress had been her mother's.

inappropriately. They both reported feeling safe at home, and were not fearful of mother or father.

## DISCUSSION

Father contends that insufficient evidence supported jurisdiction over his three children, D., Juan Jr., and Di.. In particular, father argues the physical and sexual abuse of J. was insufficient to establish a substantial risk to the younger siblings of physical or sexual abuse.

**Mootness**

Respondent contends the appeal is moot because of a subsequent juvenile court order which terminated jurisdiction. Respondent also points out that father does not challenge the findings that he sexually or physically abused J. or that mother failed to adequately protect her, and that the juvenile court terminated jurisdiction upon entry of a family law order granting sole legal and physical custody to mother.

J.'s dependency was adjudicated under section 300, subdivisions (b) and (d), which include as a basis for jurisdiction not only the abuse by father, but also mother's failure to adequately protect her. The dependency of the remaining children was adjudicated under subdivision (j) and also in part on the basis of the sustained allegations against mother. "'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the [trial] court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*In re Drake M*. (2012) 211 Cal.App.4th 754, 762.) Thus, as mother has not joined father's appeal, the judgment may be affirmed based on findings as to mother.

Further, the vesting of jurisdiction in family court after termination of juvenile court jurisdiction renders a parent's appeal moot, unless the juvenile court's orders continue to adversely affect the parent due to the potential for collateral estoppel. (*In re Joshua C*. (1994) 24 Cal.App.4th 1544, 1547-1548.) Thus, review may be proper where

7

the parent shows a possibility of prejudice in subsequent family court proceedings. (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488-1489.) The termination order states that father is not in compliance with the case plan, which included individual counseling and verification of a sober and stable lifestyle. However, since father did not attach a copy of the family law order to his request for judicial notice, the basis of that order is unknown. Nevertheless, as a finding that father poses a substantial risk of harm to his children could possibly have severe future consequences, we reach his contentions. (See *In re Daisy H.* (2011) 192 Cal.App.4th 713, 716; *In re C.C., supra*, at p. 1489.)

**Jurisdiction under section 300, subdivision (j)**

The juvenile court declared the three younger siblings dependents after sustaining counts j-1 and j-2, alleged under section 300, subdivision (j), which provides for jurisdiction, as relevant here, where the "child's sibling has been abused or neglected, as defined in subdivision . . . (b) [or] (d) . . . , and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions. The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."

"'The "nature of the abuse or neglect of the sibling" is only one of many factors that the court is to consider in assessing whether the child is at risk of abuse or neglect in the family home. [Section 300,] [s]ubdivision (j) thus allows the court to take into consideration factors that might not be determinative if the court were adjudicating a petition filed directly under one of those subdivisions. [¶] The broad language of subdivision (j) clearly indicates that the trial court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of *any* of the subdivisions enumerated in subdivision (j). The provision thus accords the trial court greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court

8

would have in the absence of that circumstance.' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 774 (*I.J.*).)

**Substantial evidence: standard of review**

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] '"[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].'" [Citation.]" [Citation.]' [Citation.]" (*I.J., supra*, 56 Cal.4th at p. 773.)

**Substantial risk to siblings**

In his opening brief, father argued that the sexual abuse of a female child is insufficient *by itself* to support a finding that a male sibling would be at risk for sexual abuse. He relied on cases which were disapproved on that point by the California Supreme Court after the brief was filed. (See *I.J., supra*, 56 Cal.4th at pp. 780-781.)[6] In disapproving the cases on which father relied, the high court held that such evidence may be sufficient by itself where the sexual abuse was "prolonged and egregious." (*Id.* at p. 770.) In his reply brief, father argues that *I.J.* is inapplicable because the abuse in this case cannot be characterized as egregious or prolonged as in *I.J.*, or in the recent case

---

**6**      See *In re Alexis S*. (2012) 205 Cal.App.4th 48; *In re Jordan R.* (2012) 205 Cal.App.4th 111; *In re Maria R*. (2010) 185 Cal.App.4th 48; *In re Rubisela E*. (2000) 85 Cal.App.4th 177.) Father also relied on *In re David R*. (2012) 212 Cal.App.4th 576, 579, review granted March 13, 2013, S208475, which agreed with the disapproved authorities.

cited by respondent: *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962 (*In re K.R.*).

The juvenile court did not rely on the evidence of J.'s abuse, *by itself*, to find a risk of harm to her siblings, and we reject any suggestion in father's argument that the sexual abuse of a female child must be disregarded in determining the risk to her brother. *I.J.* did not hold that in all cases adjudicated under section 300, subdivision (j), the sibling abuse must have reached a certain level of severity or take place over a certain time. Rather, the court held that in cases where there is no evidence of sexual abuse or other mistreatment of a male sibling who did not witness his sister's abuse, "a father's prolonged and egregious sexual abuse of his own child may provide substantial evidence to support a finding that all his children are juvenile court dependents." (*I.J., supra*, 56 Cal.4th at p. 770.)

Engaging in *any* aberrant sexual behavior provides evidence of a substantial risk of harm to a sibling. (See *In re P.A.* (2006) 144 Cal.App.4th 1339, 1347 [two occasions of inappropriate touching], cited with approval in *I.J., supra*, 56 Cal.4th at p. 775.) Moreover, engaging in the sexual abuse of one sibling in the presence of another sibling provides additional evidence of risk, *even where the sibling is unaware of the conduct or too young to understand it*. (See *In re Andy G.* (2010) 183 Cal.App.4th 1405, 1410-1415, cited with approval in *I.J.*, at p. 775.) Here, D. and J. were in the same bed and A. was in the same room when father masturbated on J.'s back. Although the sisters were asleep during the act, they soon woke up and became aware that something bad had happened between J. and father. Juan Jr. was not in the girls' bedroom and Di. had not yet been born; however, father's "total lack of concern for whether [his children] might observe his aberrant sexual behavior" placed them all at risk of similar harm. (*In re Andy G*, *supra*, at p. 1414; see also *In re Ana C*. (2012) 204 Cal.App.4th 1317, 1331-1332.)

Further, father's sexual abuse was a topic of conversation in the family. Both D. and Juan Jr. were in the kitchen during the argument over what father had done to J., which led to his slapping J.'s face and then threatening the siblings with loss of their father and police intervention. In addition, father's criminal history includes sex-related

10

activity which demonstrates the long-term nature of father's compulsion.  Thus, the sexual abuse of J. was not the only evidence of risk of harm to her siblings, as father suggests, and consequently it was unnecessary to show that the sexual abuse was both egregious and prolonged.

Father also contends that the slapping incident was "undisputedly an isolated occurrence" and thus did not support a finding that his children were at substantial risk of physical harm.  We do not agree that this was an isolated incident, as father had previously harmed J. by sexually abusing her.  Further, the slapping was hard enough to cause a nose bleed, took place in the presence of the other children, and occurred in the course of an argument regarding father's sexual abuse.  Father then used the incident to manipulate the family into silence by threatening the younger children with the loss of their father.  The prior abuse, the slapping, father's lack of concern for J.'s injury and the children's presence during this violence, all support the juvenile court's finding that the siblings were at risk for physical harm.

**Cross-appeal**

We conclude that substantial evidence supported the jurisdictional findings and the judgment must be affirmed.  As our resolution of father's appeal renders the issues in the cross-appeal moot, we dismiss the cross-appeal.

11

## DISPOSITION

The judgment of the juvenile court is affirmed, and the cross-appeal is dismissed as moot.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST

12