Filed 8/6/13  In re D.E. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re D.E. et al., Persons Coming Under the Juvenile Court Law. | B242929 (Los Angeles County Super. Ct. No. CK93267) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. DANIEL E., Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel Zeke Zeidler, Judge.  Affirmed.

Joseph D. MacKenzie, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jessica S. Mitchell, Senior Associate County Counsel, for Plaintiff and Respondent.

_____

## SUMMARY

A father challenges the evidentiary bases for a juvenile court's finding that he sexually molested his 14-year-old stepdaughter, and the court's conclusion that father's molestation of the teen posed a substantial risk of sexual abuse to father's 15-year-old biological daughter and 13-year-old stepson who remained in the family home. We affirm.

## BACKGROUND

On April 18, 2012,[1] respondent Department of Children and Family Services (DCFS) received a referral alleging that appellant Daniel E. (father) had sexually abused his 14-year-old stepdaughter, M.M. M.M. told Los Angeles Police Department (LAPD) booking officers that father had "touched her naked body all over." M.M. later told LAPD detectives that father "touched her bare breasts and bare buttocks," and that he had "asked her to lift her shirt and also show her vagina." M.M. denied there had been any bodily penetration or exchange of fluids. M.M. had disclosed the sexual abuse to her mother, E.E. (mother). Mother (who is not a party to this appeal) had not believed her. The LAPD took M.M., father's 13-year-old stepson, C.M., and father's 15-year-old biological daughter, D.E., into protective custody.

When interviewed by DCFS at the LAPD station on April 18, M.M. told a children's social worker (CSW) that father had sexually abused her on five occasions. Each incident occurred on a Saturday when mother had gone out with D.E., leaving M.M. and C.M. home with father. Each incidence of sexual abuse took place either in M.M.'s bedroom or in the kitchen while her brother showered. M.M. described the following five incidents of sexual abuse to the CSW:

The first incident took place when M.M. was alone watching TV in the bedroom she shared with D.E. Father came into the room, asked her to lift her shirt and touched her bare breasts for about five minutes. M.M. did not resist or move away, father did not undress or make M.M. touch him. No words were exchanged and father made no provocative

---

[1] Unspecified date references are to calendar year 2012.

comments to M.M. (e.g., "you turn me on or you're so beautiful, etc."). C.M. was in his bedroom at the time.

The second incident took place when M.M. and father were in the kitchen. As M.M. approached the sink carrying dishes, father kissed her with an open mouth, pulled down her pants and underwear and rubbed his hands on her bare buttocks, fondling and kissing her for 20 to 30 minutes. During this incident, father told M.M., "'You turn me on,' and 'Can't tell or something will happen.'" C.M. was in the shower during this incident; father stopped when he heard the bathroom door open.

M.M. told the CSW that the third and fourth incidents "were the same as the 1st incident in her bedroom." The fifth incident "was the same as the 2nd incident in the kitchen." M.M. said father had not made her touch him during any incident of sexual abuse. She denied having resisted, and had not asked father to stop nor moved away from him during the sexual abuse.

M.M. had run away from home several times recently. On April 15, she ran away for two days. M.M. stayed at her boyfriend's house and also at a friend's house. On April 17, M.M. told her boyfriend's mother and the friend's mother about the sexual abuse. When asked by the CSW why she ran away, M.M.'s immediate response was, "to be with my boyfriend," followed quickly by, "I couldn't take it at home anymore." M.M. told the CSW she had told mother about father's sexual abuse on April 1, right after mother yelled at her for having unprotected sex with a boy and texting naked photos of herself to boys. M.M. then left home. Father found her a few hours later and brought her back. She went willingly with father in his car, and was not afraid of him. On April 13, M.M. told mother again about father's sexual abuse. Mother responded by having M.M. "confront" father. Both parents accused M.M. of lying. M.M. also told D.E. about the sexual abuse on April 13, but D.E. did not respond. M.M. said father had not touched her siblings. She denied any neglect, physical abuse or emotional abuse by either parent. M.M. was not afraid of mother and felt safe at home. She said she now feared father because he made a motion as if he meant to strike her when she confronted him about the sexual abuse on April 13.

After the interview the CSW observed M.M. in the lobby of the police station with her siblings. M.M. was smiling, clapping and slapping her knees. M.M.'s siblings sat nearby and did not speak to her.

The CSW interviewed each parent at the police station. Both parents denied M.M.'s allegations of sexual abuse against father. Father told the CSW he had parented M.M. since she was two years old, and claimed she had "behavioral issues" since she was three years old. Father told the CSW that M.M. had been negatively influenced by "bad friends at school" and he believed her behavior was linked to a "boy crazy" attitude. Although the parents had a policy of "no boyfriends" until age 16, they had learned that M.M. had had seven boyfriends since she was in the fifth or sixth grade. Father denied touching any of the children inappropriately, except on one occasion long ago when he had pinched M.M.'s butt affectionately.

Father did not physically discipline the children, and was rarely home alone with the children. If he was home alone with the children, he was usually outside working on the house. Father denied that mother abused or neglected the children.

Mother confirmed that M.M. had twice told her about father's alleged sexual abuse. She believed M.M. had lied because she was angry about being in trouble for sending naked pictures of herself to boys, was under the influence of "bad friends" and had manufactured the allegations to retaliate against her parents for being tough on her. Mother said M.M.'s behavior had gotten "out of control" in the past four weeks, during which she had run away three times. M.M. had been an "A" student until recently, when she developed an interest in boys. She had had several boyfriends, in violation of the family's strict no boyfriends before age 16 policy.

Mother disbelieved M.M.'s accusations against father. She told the CSW that, "'if something like that was actually happening, I would know and I would never let that happen.'" "'I would never be with someone . . . who would touch my children. I would never let anything bad happen to my children.'" Mother described father as a "good father" who treated his stepchildren the same as D.E., and who was always there for his stepchildren whom he had raised. Mother was a stay-at-home mom who was always home except when

4

she took D.E. to get her hair braided, which took one to one and a half hours. On those occasions, father stayed with M.M. and C.M.

The CSW also interviewed C.M. and D.E. at the police station. Both children believed they had been brought to the station because M.M. had run away from home. D.E. acknowledged that M.M. told her on April 13 that father had touched her inappropriately. D.E. told the CSW that M.M. and her parents had fought that day, and M.M. had written an accusation against father on a note. Mother confronted M.M. with the note and the parents went into M.M.'s room to talk. Later that night, M.M. told D.E. what the note said, but D.E. did not believe her. She did not believe father would ever inappropriately touch her or M.M., and denied that father ever made inappropriate comments. D.E. said her parents were "good parents," who disciplined the children by revoking privileges, and denied that they had committed any verbal or physical abuse or neglect. Neither D.E. not C.M. feared their parents, and neither child said that any sibling or half-sibling had ever before recounted any verbal or physical abuse or neglect.

On April 18 the parents and M.M. signed a safety plan. M.M. was placed in foster care and father agreed to leave the home until a team decision making (TDM) meeting was conducted. D.E. and C.M. remained in mother's care.

The TDM took place on April 25, and was attended by the parents, the children, a CSW and several maternal relatives. The relatives were adamant that father was falsely accused, and emphatically supported father's character and mother and father's parenting abilities. They all believed that M.M., whose behavior began to deteriorate after she developed an interest in boys and began hanging out with the wrong crowd, had manufactured the allegations against father with coaching from her friends after the parents confronted her about sending her naked pictures to boys and engaging in vulgar communications on Facebook. At the TDM, and in later meetings, maternal and paternal relatives told DCFS the parents posed no danger to the children; they were adamant that father would not have inappropriately touched M.M.

M.M. described father's sexual abuse during the TDM. She also recounted how, after the confrontation with her parents on April 13 about the sexual abuse, father returned to her

5

bedroom at mother's request, to hit her with a belt. Mother was "visibly upset" at the TDM by M.M.'s description of the sexual abuse perpetrated by father. She adamantly refused to believe M.M. and accused the girl of lying and deliberately destroying the family so she could have more freedom to see her boyfriend. Father persisted in his denial of the allegations of sexual abuse. D.E. and C.M. denied abuse or neglect by either parent, either of themselves or of M.M.

The CSW noted that the details of M.M.'s stories "change and appear inconsistent." However, because the child's basic accusation of sexual abuse by father on five occasions was unwavering, and because mother refused to credit her daughter's disclosures, DCFS recommended that the petition be sustained. M.M. was taken into protective custody and placed her in foster care. The other children were released to mother. Father agreed to move out, and the family agreed to have DCFS pursue court intervention.

On April 26, the CSW spoke with close family friends and neighbors, Mr. and Ms. Harris. Ms. Harris, who has known father since 1999, described him as a wonderful, decent, and caring man who treated M.M. like his own daughter. She said her husband, a former detective, had spent the past year trying to brainstorm with father about behavioral problems developing with M.M. Ms. Harris told DCFS that M.M. had "threatened" the parents a few years back telling them, "You can't touch me or I'm going to tell the police." Mr. Harris told the CSW that for the past several months, father had been calling him more frequently to seek his advice as to how to "help" M.M. Mr. Harris, who knew about the allegations of sexual abuse, said that based on his experience as a detective, father did not act like a perpetrator of sexual abuse. Perpetrators wanted to keep their victims close by so they could monitor their activities; father had been working hard to find help for M.M. and had been looking into sending her to a therapeutic/boot camp.

On April 30, DCFS filed a Welfare and Institutions Code section 300[2] petition on behalf of all three children. The petition alleged that father had physically and sexually

---

[2] All further statutory references are to the Welfare and Institutions Code.

abused M.M., and that mother failed to protect her which created a detrimental home environment and placed all three children at risk of physical danger and/or sexual abuse.[3] On April 30, M.M. was detained from the parents and placed in foster care. D.E. and C.M. were detained from father and released to mother's care. Father was given monitored visits with D.E. and C.M., and denied contact with M.M.

DCFS interviewed the children and mother in preparation for the June 20 adjudication and disposition hearing. M.M. told DCFS that the last time father hit her with a belt was in April 2012, after she ran away. M.M. said father inappropriately touched her butt and breasts when she was 13, and had seen her vagina. He sexually abused her five times. The abuse occurred in her bedroom, the living room and the kitchen. The first time, mother had gone with D.E. to get her hair braided and C.M. had been in his room. M.M. said father told her to lift up her shirt, and "[h]e saw my boobs and touched them and then left. I am scared of him. I didn't say anything. He grabbed my boobs from the front. I didn't have nay [*sic*] bra on. . . . He just touched me and left."

The next time, father saw M.M.'s vagina. M.M. said, "[h]e told me to zip down my pants. I zipped down my pants and lifted my underwear up. . . . Then, I left the living room." On the third occasion, M.M. said father was in the kitchen and "[h]e pulled down my pants. He touched my butt from behind. He pulled my underwear down. . . . He said, 'You turn me on.' He kept touching my butt. . . . My brother was home. He was taking a shower." M.M. said the fourth incident was the same as the third. She was unable to describe the fifth incident.

M.M. said that when she first told mother about the sexual abuse mother reacted by speaking negatively about M.M.'s biological father, and said M.M. did not appreciate father. M.M. added, "I think he [father] kissed me in the kitchen. He was making out. I didn't tell anyone because I'm scared of him and my mom wouldn't believe me anyway. He didn't threaten me. He just said, 'Don't tell anyone.'"

---

[3] The physical abuse allegations were ultimately dismissed.

D.E. told DCFS that M.M. made up the accusations of sexual abuse against father to retaliate against the parents for revoking her privileges. She wanted the court to know "that our dad never looked at us or her in the wrong way. She is lying. She needs to be somewhere to get help. I want our dad to come back."

C.M. also denied having suffered any physical or sexual abuse, and was not aware of any inappropriate touching having taken place within his family. He said the parents had hit the children with a belt when they were six or seven years old, and said father had also hit M.M. with a belt in mother's presence. C.M. had been in his bedroom when that happened. C.M. believed M.M. was removed because father hit her with a belt.

Mother reiterated to DCFS that she believed M.M. was lying about the sexual abuse, and was "just retaliating" against the parents because they revoked privileges after finding out M.M. planned to have sex with her boyfriend, and after mother learned M.M. had sent her nude photos to boys.

In a last minute information, DCFS reported that father denied hitting M.M. with a belt. He claimed he had only pretended he would strike her to scare her. Mother had been present, and M.M. screamed and mother told father to leave the room. Father said the parents disciplined all of the kids by revoking privileges. But father also said that after M.M. ran away a second time, the police told him he could spank her with a belt over her clothes. He said he never would have spanked her with a belt if the police hadn't told him to do so. Father said M.M. made up the claim of sexual abuse at the urging of her new friends and in order to run away.

The adjudication and disposition hearings were conducted on July 10. M.M. testified that father sexually abused her five times. The first time he touched her she was on a Saturday morning. She was in her bedroom; C.M. was also home, but he was in his own bedroom. Father came into her bedroom, left the door open and told her to lift up her shirt. He did not say anything else to her after the sexual abuse. M.M. could not recall where in the house father sexually abused her on the second occasion. She remembered that he pulled down her pants, touched her butt and said, "You turn me on." The third and fourth incidents

occurred in the same way as the second one. Father told her to zip down her pants to look at her vagina. He looked at but did not touch M.M.'s "boobs."

M.M. told mother about the abuse after the fifth incident. M.M. also testified that father's sexual abuse of her began early in 2011, and the fifth incident took place at the end of 2011.

M.M. used to call father "dad." After M.M. told mother about the sexual abuse, father hit M.M. on the leg with a belt. M.M. denied that she was upset with father for having rules. She denied that her friends and boyfriend were gang members, and denied that she made up allegations of sexual abuse to avoid going to boot camp or in order to move out of the family's home.

M.M. told her ex-boyfriend and the boyfriend's mother that father sexually abused her. M.M. told mother about the sexual abuse in April 2012 "because she was yelling at me, and I felt pressured." She told mother about the sexual abuse twice, once orally and once in writing. The first time mother said M.M. was lying. The second time, mother came to M.M.'s bedroom and had father hit her with a belt. Mother yelled at her, saying, "'You are going to mess up our family. You are such a liar. You are a whore. I wish you were pregnant. You're dead to me.'" Father told M.M. not to tell mother about the sexual abuse after the third time. He kissed M.M. on the mouth more than once. M.M. was mad that mother did not believe her.

Mother testified that M.M. made up the accusations against father because she wanted "to do what [M.M.] wants to do," which meant "hanging out with her friends and be fast and be with her boyfriends, her seven boyfriends, whoever she wants to talk to." Mother acknowledged that lifting up a shirt to look at a teenager's breasts would constitute sexual abuse. Father did not testify.

At the conclusion of the adjudication hearing, the court dismissed the physical abuse counts under section 300, subdivision (a), and sustained the sexual abuse counts under

9

section 300, subdivisions (b), (d), and (j).[4]  The court found all three children were persons described by section 300, subdivisions (b) and (d), and that D.E. and C.M. were also described by section 300, subdivision (j).  Proceeding to disposition, the juvenile court declared the children dependents, removed M.M. from the parents' custody and placed her in foster care.  The other children remained in mother's care.  DCFS was ordered to provide father with reunification services for D.E.  Father was ordered to participate in a parenting program, sex abuse and individual counseling, and was given monitored visits with D.E.  He appeals.

## DISCUSSION

Father insists that the record contains insufficient credible evidence to support the juvenile court's finding that he sexually abused M.M. within the meaning of section 300, subdivision (d).  He also argues there is insufficient evidence to support the court's jurisdictional findings as to D.E. and C.M. under section 300, subdivisions (b) and (j).

We review the juvenile court's jurisdictional findings for substantial evidence.  (*In re E.B.* (2010) 184 Cal.App.4th 568, 574–575; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.)  Substantial evidence is "evidence that is reasonable, credible and of solid value."  (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1401.)  Under the substantial evidence standard, we examine the whole record in a light most favorable to the findings and conclusions of the juvenile court and defer to that court on issues of witness and evidentiary credibility.  (*In re E.B.*, at pp. 574–575.)

---

[4] The sexual abuse counts, identically pleaded under section 300, subdivisions (b), (d), and (j)  read:  "On or about 04/13/12, and on prior occasions, . . . father . . . sexually abused the child [M.M.]  The children's mother knew of the sexual abuse of the child by . . . father and failed to protect the child.  Such sexual abuse of the child by . . . father and the mother's failure to protect the child endangers the child's physical health and safety, and creates a detrimental home environment, placing the child and the child's siblings . . . at risk of physical harm, damage, danger, sexual abuse and failure to protect."

*1.     Substantial evidence supports the finding that father sexually abused M.M.*

Father argues that there was insufficient evidence to support the juvenile court's finding that he sexually abused M.M.  This argument lacks merit.

Section 300, subdivision (d) states in relevant part that jurisdiction over a child arises when "[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused . . . by his or her parent . . . or the parent . . . has failed to adequately protect the child from sexual abuse when the parent . . . knew or reasonably should have known that the child was in danger of sexual abuse."

As summarized above, M.M. informed the police and DCFS that father committed numerous acts of sexual abuse against her.  She also testified about these occurrences during the adjudication hearing.  After reviewing the evidence and listening to testimony by mother and M.M. at the adjudication hearing, the court acknowledged that there were inconsistencies in M.M.'s recounting of the incidents of molestation.  But, the court nevertheless observed that M.M. had been "consistent about [father's] comments to her including . . . "'you turn me on.'"  In the end, the court found that M.M. was "very credible."

As in most cases involving claims of sexual abuse of children, this one hinges almost entirely on who has lied and who has told the truth.  Father insists we must reject the juvenile court's findings because of "inconsistencies" in M.M.'s statements and because family and friends overwhelmingly attested to father's good moral character.  He also asserts the court erred in relying on M.M.'s consistent repetition that father told her "[y]ou turn me on."  He insists the phrase was suggested to M.M. by "leading questions" from the CSW that "grossly contaminated" the initial interview and M.M.'s subsequent statements because she had never said father made such a statement before the CSW asked if he had.

Father's argument overlooks the limited nature of our review.  We determine only whether the record contains substantial evidence, contradicted or not, to support the juvenile court's order, resolving all conflicts in support of the "determination and indulging all legitimate inferences to uphold the trial court's ruling."  (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212.)  We defer to the lower court on issues of credibility.  (*In re E.B.*, *supra*, 184 Cal.App.4th at pp. 574–575.)  If substantial evidence supports the juvenile court's finding,

11

we must uphold the order even if other evidence would support a different conclusion. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 250.) Testimony by even "a single witness can be sufficient to uphold a judgment." (*In re Rubisela E.* (2000) 85 Cal.App.4th 177, 195, disapproved on another ground by *In re I.J.* (2013) 56 Cal.4th 766 (*I.J.*).)

Because the record contains substantial evidence that father sexually abused M.M., we affirm the juvenile court's finding on this point. (See *Rubisela E.*, *supra*, 85 Cal.App.4th at p. 195 [rejecting father's argument that "inconsistencies in [child's] retelling of the incident to various investigators . . . compel a conclusion that her testimony and evidence as a whole does not support a finding that Father ever touched [child] in a sexual way"]; *In re P.A.* (2006) 144 Cal.App.4th 1339, 1343–1344 [rejecting father's arguments that "inconsistencies in [child's] various statements and the absence of any corroborating evidence precluded a finding that father sexually abused the child"].) Substantial evidence supports the finding that M.M. is a child described by section 300, subdivision (d).

2. *Father's sexual abuse of M.M. puts her siblings at substantial risk of harm.*

Father maintains that the juvenile court's findings require reversal because there has been no showing of a substantial risk of harm to his biological daughter or stepson. We reject father's contention.

Jurisdiction over a child under section 300 may be established if "there is a substantial risk that the child will be sexually abused . . . by his or her parent or guardian or a member of his or her household" (§ 300, subd. (d)); or if "[t]he child's sibling has been abused or neglected, as defined in subdivisions . . . (b) [or] (d) . . . , and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions" (§ 300, subd. (j)). Under subdivision (j), the court is required to "consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." (§ 300, subd. (j); *In re Maria R.* (2010) 185 Cal.App.4th 48, 64, disapproved on another ground by *I.J.*, *supra*, 56 Cal.4th at p. ___.)

12

Most courts have held that sexual abuse of one child constitutes substantial evidence of risk to the child's siblings who remain in the household, even if the other child is a different gender, age or is a half sibling. (See e.g., *I.J.*, *supra*, 56 Cal.4th at p. ___; *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 964 [father's sexual abuse of stepdaughter five or six years earlier poses risk of sexual abuse to his biological daughter]; *In re Ricky T.* (2013) 214 Cal.App.4th 515, 523–524 [grandfather's criminal conviction for sexual abuse of step-granddaughters placed grandson at risk]; *In re Ana C.* (2012) 204 Cal.App.4th 1317, 1332 [sexual abuse of female child alone is sufficient to place a male child at risk]; *In re Andy G.* (2010) 183 Cal.App.4th 1405, 1407 [two-year-old boy at risk due to father's sexual abuse of the boy's 12 and 14–year–old half sisters]; *In re P.A.*, *supra*, 144 Cal.App.4th at p. 1345 [father's sexual abuse of daughter posed risk of sexual abuse to girl's younger brothers]; *In re Karen R.* (2001) 95 Cal.App.4th 84, 91 [father's rape of his minor daughter could reasonably be considered "so sexually aberrant" that the victim's male and female siblings are also at substantial risk of sexual abuse]; *Rubisela E.*, *supra*, 85 Cal.App.4th at pp.197-199 [sexual abuse of 13–year–old daughter supports finding of risk to 9–year–old daughter, and poses risk of harm, either by molestation or by the fact of molestation within the family, to male siblings]; *In re Joshua J.* (1995) 39 Cal.App.4th 984, 987, 994 [father's sexual abuse of six-month-old boy also posed risk of sexual abuse to newborn son].)

The California Supreme Court recently resolved the question of whether a man's sexual molestation of a female child, by itself, may place male children in the home at substantial risk of sexual abuse. In *I.J.*, *supra*, 56 Cal.4th 766, the court affirmed a decision finding that a father's sexual abuse of his 14-year-old daughter placed the girl's three brothers (12-year old twins and an eight year old) at risk of harm, as defined by section 300, subdivision (j), even though none of the boys was mistreated, and none had witnessed nor been aware of the father's sexual abuse. (*Id*. at p. 771.)

The court focused on section 300, subdivision (j), observing that it "applies if (1) the child's sibling has been abused or neglected as defined in specified other subdivisions and (2) there is a substantial risk that the child will be abused or neglected as defined in those

13

subdivisions." (*I.J.*, *supra*, 56 Cal.4th at p. 774.) Because the "father sexually abused the boys' sister as defined in subdivision (d)[,] . . . the first requirement [was] met." (*Ibid*.) At issue was the second requirement. "'[S]ubdivision (j) was intended to expand the grounds for the exercise of jurisdiction as to children whose sibling has been abused or neglected as defined in section 300, subdivision (a), (b), (d), (e), or (i). Subdivision (j) *does not* state that its application is limited to the risk that the child will be abused or neglected *as defined in the same subdivision* that describes the abuse or neglect of the sibling. Rather, subdivision (j) directs the trial court to consider whether there is a substantial risk that the child will be harmed under subdivision (a), (b), (d), (e) or (i) of section 300, notwithstanding which of those subdivisions describes the child's sibling.' [Citation.]" (*Ibid*.) The court observed that the "'broad language of subdivision (j) clearly indicates that the trial court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of *any* of the subdivisions enumerated in subdivision (j). The provision thus accords the trial court greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance.' [Citation.]" (*Ibid*.)

In *I.J.*, *supra*, 56 Cal.4th 766, the father's behavior was described as "'aberrant in the extreme: he sexually abused his own daughter "by fondling the child's vagina and digitally penetrating the child's vagina and forcefully raped the child by placing the father's penis in the child's vagina."' Also relevant to the totality of the circumstances surrounding the sibling abuse is the violation of trust shown by sexually abusing one child while the other children were living in the same home and could easily have learned of or even interrupted the abuse. '[S]exual or other serious physical abuse of a child by an adult constitutes a fundamental betrayal of the appropriate relationship between the generations. . . . When a parent abuses his or her own child, . . . the parent also abandons and contravenes the parental role. Such misparenting is among the specific compelling circumstances which may justify state intervention, including an interruption of parental custody. (See § 300, subds. (d), (e), (j).)' [Citation.]" (*Id*. at p. 778.) The court found that the "serious and prolonged nature of

father's sexual abuse of his daughter under these circumstances support[ed] the juvenile court's finding that the risk of abuse was substantial as to all the children." (*Ibid.*)

Father's efforts to distinguish this action from the reasoning of *I.J.*, *supra*, 56 Cal.4th 766 and its predecessors fails. In *Rubisela E.*, *supra*, 85 Cal.App.4th 177, a father sexually abused his 13-year-old daughter. Five other siblings (four boys and one girl) had not seen the molestation and had not been targeted. The court upheld the jurisdictional finding as to the female sibling, but reversed as to the male siblings, finding the boys were not at risk of abuse. (*Id.* at pp. 197, 199.) Pointing to *Rubisela E.*, father argues that the juvenile court's findings as to risks posed to C.M. lack support as "there is no evidence [he] had any homosexual interests or sexual encounters with males of any age or at any time." Father misses the point. Although the court in *Rubisela E.* did not find male siblings at risk of sexual abuse, it found that the brother of a molested sister could suffer harm: "[B]rothers of molested sisters can be . . . harmed by the fact of the molestation within the family. Brothers can be harmed by the knowledge that a parent has so abused the trust of their sister. They can even be harmed by the denial of the perpetrator, the spouse's acquiescence in the denial or their parents' efforts to embrace them a web of denial." (*Id.* at p. 198.) Here, as in *Rubisela E.*, father sexually abused C.M.'s teenage sister and both parents adamantly denied the molestation occurred.

In *Karen R.*, *supra*, 95 Cal.App.4th 84, the court found that "a father who has committed two incidents of forcible incestuous rape of his minor daughter reasonably can be said to be so sexually aberrant that both male and female siblings of the victim are at substantial risk of sexual abuse . . . if left in the home." (*Id.* at p. 84.) Father insists this case is unlike *Karen R.*, because his abuse of his stepdaughter M.M. was not incestuous. The record reflects otherwise. Father has raised M.M. as if she were his own child since she was a toddler, has provided for her and has held himself out as her father. Until the sexual abuse was revealed, M.M. referred to father as her "dad." Father has gone to similar lengths to establish and cement a parental relationship with C.M. Indeed, before this case arose, the parents had never told C.M. that father was not his biological parent.

15

Father also attempts to distinguish *In re P.A.*, *supra*, 144 Cal.App.4th at page 1339, on the ground that D.E. has passed the age at which his abuse of M.M. began, though he acknowledges that C.M. was approaching that age. But father ignores the larger point of *In re P.A.* which is that, "aberrant sexual behavior by a parent places the victim's siblings who remain in the home at risk of aberrant sexual behavior." (*Id.* at p. 1347, fn. omitted.)

Finally, father attempts to distinguish *Andy G.*, *supra*, 183 Cal.App.4th at page 1405, in which two female siblings, 12 and 14 years old, were sexually abused by their father. But in *Andy G.*, adhering to the rationale of *In re P.A.*, *supra*, 144 Cal.App.4th 1339, the court found that the father's sexual abuse of the girls was enough to establish a risk of abuse to their two-year-old male sibling, who was not close to the age at which his sisters' abuse had begun. Ignoring this point, father argues only that he never used C.M. as a vehicle to entice M.M. to come close so he could expose himself to her.

As clarified in *I.J.*, *supra*, 56 Cal.4th 766, and previously explained in *In re P.A.*, *supra*, 144 Cal.App.4th 1339, "where, as here, a child has been sexually abused, any younger sibling who is approaching the age at which the child was abused, may be found to be at risk of sexual abuse[, and] . . . aberrant sexual behavior by a parent places the victim's siblings who remain in the home at risk of aberrant sexual behavior." (*In re P.A.*, at p. 1347, fn. omitted; *I.J.*, at p. 776.) "[S]ubdivision (j) implies that the more egregious the abuse, the more appropriate for the juvenile court to assume jurisdiction over the siblings. . . . 'Some risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great. . . .'" (*I.J.*, at p. 778.) Here, the juvenile court found M.M.'s accounts of father's egregious sexual abuse quite credible. The nature of that abuse, coupled with the fact that it took place while C.M. was present in the home constitutes sufficient evidence to support the juvenile court's finding that C.M. was at substantial risk of harm.

Moreover, this case involves not just father's illicit conduct toward M.M., but also mother's failure to protect. The juvenile court sustained allegations that mother knew about father's sexual molestation of M.M. and failed to protect her daughter. At trial, mother admitted that M.M. told her twice about father's sexual abuse. But mother disbelieved M.M. and so made no effort to keep father from her.

The evidentiary record reflects that mother reasonably should have known that M.M. was being sexually abused. Under section 300, subdivision (b), the same evidence established that mother's conduct toward M.M. constituted a failure to "adequately supervise or protect the child," who suffered "physical harm" within the meaning of the statute. (§ 300, subd. (b).) "It may be inferred from the fact of a lewd touching that the victim suffered serious physical harm" within the meaning of section 300, subdivision (b). (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 398.)

Mother has not appealed the jurisdictional findings as they relate to her. Under *In re Kieshia E.* (1993) 6 Cal.4th 68, 76–77, both parents have abandoned and contravened their parental roles: father perpetrated the sexual abuse and mother failed to stop it. Mother's conduct is tantamount to the "web of denial" condemned in *Rubisela E.*, and harms all her children. (*Rubisela E.*, *supra*, 85 Cal.App.4th at p. 198.) In light of the parents' conduct, it was reasonable for the court to conclude that both D.E. and C.M. remained at risk of harm in the home.

The sustained allegations of sexual abuse by father of his stepdaughter demonstrate significant misparenting. No less may be said of mother's failure to protect the children in the family's home. In the absence of appropriate parenting, the juvenile court reasonably found that D.E. and C.M. were also at risk of harm under section 300, subdivisions (b) and (j). Substantial evidence supports that conclusion.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


I concur:


MALLANO, P. J.


17

Rothschild, J., concurring and dissenting:

I agree that, despite the serious concerns about the credibility of M.M.'s statements, the extremely deferential standard of review compels affirmance of the jurisdictional findings as to both female children, M.M. and D.E. I disagree, however, with the majority's conclusion that the jurisdictional finding as to the male child, C.M., is supported by substantial evidence, and I accordingly dissent in part.

The petition alleges that C.M. comes within the jurisdiction of the juvenile court pursuant to subdivisions (a), (b), (d), and (j) of Welfare and Institutions Code section 300.[1] The juvenile court found that C.M. came within its jurisdiction pursuant to subdivisions (b), (d), and (j) of section 300. Accordingly, the sole issue on appeal as to C.M. is whether the record contains substantial evidence supporting the assertion of jurisdiction over C.M. pursuant to one of those subdivisions.

The record does not contain such evidence. The majority's contrary conclusion is based on a misapplication, in my view, of the Supreme Court's recent decision in *In re I.J.* (2013) 56 Cal.4th 766. In that case, the father had repeatedly sexually abused his teenage daughter over the course of three years. (*Id.* at p. 771.) The sexual abuse included fondling, digital penetration of the child's vagina, oral copulation of the child's vagina, forcing the child to watch pornographic videos with the father, and forcible rape. (*Ibid.*) The Court considered "the totality of the circumstances" (*id.* at p. 774, internal quotation marks omitted) and concluded that, given the father's "prolonged and egregious sexual abuse of his own child," the record supported "a finding that all his children are juvenile court dependents." (*Id.* at p. 770.) The Court cautioned, however, against an overbroad interpretation of its decision: "In upholding the assertion of jurisdiction in this case, we are not holding that the juvenile court is compelled, as a matter of law, to assume jurisdiction over all the children whenever one child is sexually abused. We merely hold the evidence in this case supports the juvenile court's assertion of

---

[1] All subsequent statutory references are to the Welfare and Institutions Code.

jurisdiction." (*Id.* at p. 780.) And the Court cited with approval *In re Jordan R.* (2012) 205 Cal.App.4th 111, 136-139, which affirmed the juvenile court's assertion of jurisdiction over the daughter of a man who sexually abused his teenage niece but also affirmed the court's refusal to assert jurisdiction over the same man's son. (*In re I.J.*, at p. 780.)

I believe that *In re I.J.* is distinguishable and does not require affirmance of the assertion of jurisdiction over C.M. The sexual abuse of the daughter in *In re I.J.* (fondling, digital penetration, oral copulation, compelled viewing of pornographic videos, and forcible rape) was undeniably more severe than the sexual abuse of M.M. (fondling and kissing, no penetration or genital contact of any kind). The sexual abuse in *In re I.J.* also continued over a substantially longer period (three years) than the sexual abuse in this case (less than one year). In addition, the record contains no evidence that father has ever had any homosexual interests or sexual encounters with males of any age at any time, a factor not mentioned in *In re I.J.*

In view of "the totality of the circumstances" (*In re I.J.*, *supra*, 56 Cal.4th at p. 774), I believe that the record does not contain substantial evidence that C.M. is at substantial risk of nonaccidentally inflicted serious physical harm, sexual abuse, or the other forms of abuse or neglect listed in subdivision (j) of section 300. I therefore would reverse the juvenile court's jurisdictional finding as to C.M.


                                                    ROTHSCHILD, J.


2