Filed 1/13/15  In re J.S. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.S., a Person Coming Under the Juvenile Court Law. | B255857 (Los Angeles County Super. Ct. No. DK02634) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ARMANDO S., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Julie Fox Blackshaw, Judge.  Affirmed.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

A father appeals jurisdictional and dispositional findings made with respect to his son. He contends evidence of his sexual abuse of the boy's two younger nieces is insufficient to show his son was at risk of harm in his care. The father also argues there is insufficient evidence to support the juvenile court's order removing his son from his custody or that there were no reasonable means to protect the boy short of removal from father's care. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Before respondent Department of Children and Family Services (DCFS) initiated this matter, 11-year-old J.S., the sole subject of this appeal, lived with his mother, O.C. (mother),[1] his biological father and mother's long-term companion, appellant Armando S. (father), his half-sister Gabriela C., and various members of his extended family. On November 12, 2013, sheriff's deputies executed a search warrant at the family's home in the course of an investigation of J.S.'s adult half-brother, Mario C., for the alleged rape of a teenager. DCFS was contacted, and a social worker came to the home to investigate, after deputies determined the minor children in the home were at risk based on Mario's endangering conduct.

In the course of that investigation, then 15-year-old Gabriela became upset and told the social worker that it was "awkward" having father back in the home,[2] and that the children all went to their rooms whenever he came in. Gabriela said that N.C., her 10-year-old niece and other's granddaughter, had disclosed that father touched her in an inappropriate way during a family trip to visit a relative in Sacramento. While at the relative's home, father asked N.C. to sleep on the floor with him, and touched her over her clothing, while mother and other children slept in a bed in the same room. Gabriela

---

[1] Mother is not a party to this appeal.

[2] Father, who had been in a romantic relationship with mother for over 12 years, moved out of the family home in January 2013 to live with another woman, but had returned two weeks earlier. Mother had forgiven father, but her adult children remained angry and disagreed with the decision to allow him to return. As a result, mother and father stayed together in a converted room apart from the rest of the family, whom father mostly avoided.

said she and N.C. had shared this information with their respective mothers. N.C. confirmed Gabriela's story. She told the social worker that during that trip, father told her to sleep on the floor with him. After she laid next to father he pulled the blankets over her and touched her on her breasts, the sides of her body, squeezed her buttocks and leaned over her running his lips from side to side over hers and kissing her. N.C. ran to the bathroom to hide, but returned after father came looking for her. N.C. told her mother, Alicia C., and Gabriela what father had done. Alicia spoke to the other adults in the home and they agreed none of the children should have any unsupervised contact with father. N.C. and Alicia had not lived in the family home at the time of the incident in Sacramento, but had moved in after father moved out. N.C. told the social worker that since father's return, she had not been alone with or had any sort of relationship with him.

The social worker spoke with another of mother's grandchildren, six-year-old F.C., who appeared somewhat apprehensive. When the children's social worker asked F.C. if any child in the home had been hurt, F.C. at first refused to answer the question and looked down, but then said that she had been hurt. However, she refused to disclose how she had been hurt and refused further interactions with the social worker.

J.S. told the social worker he had never heard anyone talk about any of the children being touched on their private areas. He knew to call the police and tell mother if anyone tried to touch him.

When asked if he had ever been accused of perpetrating sexual abuse, father acknowledged that eight months after the family's trip to Sacramento, N.C. claimed he had touched her inappropriately on that trip. He admitted having asked N.C. to sleep on the floor with him, but denied touching or kissing the child. Father agreed to move out of the family residence, said he would do what he needed in order to reunite his family and agreed to a safety plan.

N.C. and F.C. underwent forensic medical exams. During her exam, N.C. told a nurse that when she was eight or nine years old, she had been sleeping with her cousins on a bed while father was on the floor. He woke her up and told her to sleep with him. He got on top of her, put his lips on hers and made a sliding motion. She felt safe now

3

that he was out of the home. During her examination, F.C. said she was afraid of father because he had touched her vaginal area three times under her clothes when she was four years old. There had been no penetration. Both girls' physical exams were normal and neither confirmed nor negated sexual abuse.

When mother met with DCFS on December 5, 2013, she expressed disbelief that father had sexually abused her grandchildren. She wanted to maintain her relationship with him.

On December 10, 2013, DCFS filed a Welfare and Institutions Code[3] section 300 petition on behalf of Gabriela and J.S. alleging that the children were at risk due to father's sexual abuse of N.C. and F.C., and mother's failure to protect them. At the detention hearing on December 10, 2013, father was deemed J.S.'s presumed father. J.S. was detained from his custody, and father was given monitored visitation. J.S. and Gabriela remained in mother's care.

Gabriela was interviewed by a DCFS Dependency Investigator (DI) on February 4, 2014. She said that during a family trip to see her brother in Sacramento three years earlier, N.C. told her that father asked her to sleep with him on the floor before getting on top of her, kissing her and trying to touch her buttocks. The rest of the family was told about the incident and agreed father could not be left alone with any child. Afterwards, Gabriela, J.S., mother and father had lived in the converted room. The other children in the family were sent to their rooms whenever father went into the main house. Gabriela did not think anyone was aware of father's sexual abuse of F.C. before her forensic exam.

J.S. told the DI he knew nothing about what happened and did not believe his father would do what he had been accused of doing. He described father as "one of the good guys."

---

[3] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

N.C. told the DI that when the family went to Sacramento, she had gone to sleep in the bed with mother, but father woke her up and told her to sleep on the floor with him. She moved to the floor and went back to sleep, but awoke to find father on top of her, kissing her on the mouth. As she pulled away, father began touching her buttocks and breasts over her clothes. N.C. got scared and ran to the bathroom. She tried to leave the room to tell her mother what happened, but father grabbed her and put her back on the bed. Later, N.C. told Gabriela and they both told N.C.'s mother, who informed the rest of the family and the children were kept away from father. N.C. first learned about father's molestation of F.C. when she heard what F.C. told the forensic examiner.

When F.C. met with the DI in early February 2014, she said father touched her vagina by placing his hand under her underwear. She had asked him for some gum when he grabbed her and began kissing her on the mouth. After his hand was in her underwear, father began fondling her with his finger. He rubbed her buttocks while touching her vagina. F.C. also said father had tried to touch her another time, but could not provide a time frame. F.C. said that the second time, father had grabbed her and tried convincing her to go in the converted room saying he had gum, but she got away. She could not say why she had never said anything about the abuse.

Mother acknowledged that one day about a year after the trip when she picked N.C. up from school, her granddaughter told her father had sexually abused her during the trip to Sacramento. She did not believe N.C. who made the disclosure in a nonchalant manner. Because of the child's disclosure, and in order to avoid "serious problems" mother decided she would no longer take care of N.C. She told Alicia she could no longer care for the child, but did not mention N.C.'s disclosure. Mother knew nothing about father fondling F.C. She said father was a good person who helped her care for her children when they were young.

The jurisdictional hearing was conducted on April 14, 2014. DCFS's reports were received into evidence. Alicia testified that on one occasion the whole family took a trip to visit her brother at his two-story apartment in Sacramento. Alicia slept downstairs. Mother, father, N.C., J.S., a nephew, and a niece slept upstairs. Alicia testified that

5

N.C.'s demeanor was unchanged the day after the incident of abuse, which N.C. did not disclose until four or five months later. In November or December of 2011, after N.C. told her about the abuse, Alicia told her brothers and they agreed to keep the children away from father. Since then, to Alicia's knowledge, N.C. had never been alone with father. The only time N.C. and father had lived in the same home was the two or three week period before the deputies came to the home with the search warrant. Alicia testified that mother knew what had happened to N.C., but did not believe it. Father had never been kept away from Gabriela or J.S.

F.C. is Alicia's niece. F.C.'s mother, D.P. had been a stay-at-home mom for eight years. Alicia was not aware that father ever babysat F.C., but there had been a period, when F.C. was about four years old, when the child and father lived in the same house. They also lived together after father returned and he and mother moved into the converted room.

Seven-year-old F.C. testified in chambers that D.P. never told her not to be around father. She said father had touched her in her "middle part" (pointing to her crotch) and kissed her when she was four or five years old. The incident happened at mother's house. F.C. did not like it when father touched her like that, which he did twice.

In closing argument counsel for DCFS requested that the court sustain the petition as to the allegations pleaded under section 300, subdivisions (b) and (d) based on the statements by N.C. and F.C. Children's counsel agreed and urged the court also to find J.S. was at risk even though he is male, based on father's predilection for prepubescent girls with "boyish" rather than "womanly" features, and observing that mother could not be counted on to protect the children.

Father's attorney argued that the alleged conduct was not egregious enough to justify including J.S. in the petition, particularly given his denial that he had been touched, and the fact that N.C. and F.C. were not related by blood, only "kind of related" to father by virtue of his relationship with mother.

The juvenile court sustained the allegations under section 300, subdivisions (b) and (d). The court referred to statements made by N.C. and F.C., observing that the

6

sexual misconduct they described was covered by section 300, subdivision (d). The court also sustained the allegations as to J.S., observing that there was not "much distinction in the body types" between father's prepubescent victims and the young boy.[4] The court also noted that father had engaged in sexual misconduct in the family's home and there was no "reason to believe that [he] would be deterred from possibly doing so to his own son in the family home, as well."

Proceeding to disposition, the court declared the children dependents under section 300, subdivisions (b) and (d), and removed J.S. from father's custody. Father was ordered to participate in sexual abuse and individual counseling, parenting classes, and joint counseling with J.S. Father was given two hour unmonitored visits with J.S. in a public place during daytime hours. He appeals.

## DISCUSSION

1. *Substantial evidence supports the jurisdictional findings*

Father contends that the evidence that he sexually abused two unrelated female children does not support the juvenile court's jurisdictional findings as to his son under section 300 subdivisions (b) or (d).

---

[4] The court sustained the allegations under section 300, subdivisions (b) and (d) as follows:

"The children, Gabriela C[.] and [J.S.]'s mother['s] . . . male companion, . . . father of the child [J.S.], sexually abused the children's ten-year-old niece, [N.C.], in which . . . father fondled the niece's breasts, squeezed the niece's buttocks and kissed the niece's lips. The . . . father placed his body on top of the niece's body, simulating sexual intercourse. The mother failed to protect the children when she knew of . . . father's sexual abuse of the niece. The mother allowed . . . father to reside in the children's home and have unlimited access to the children. Such sexual abuse of the niece by . . . father, and the mother's failure to protect the children, endangers the children's physical health and safety, and places the children at risk of physical harm, damage, danger, sexual abuse and failure to protect."

"The children, Gabriela C[.] and [J.S.]'s mother['s] . . . male companion, . . . father of the child [J.S.], sexually abused the children's six-year-old niece, [F.C.], in which . . . father repeatedly fondled the niece's vagina. Such sexual abuse of the niece by . . . father endangers the children's physical health and safety and places the children at risk of physical harm, damage, danger, [and] sexual abuse."

7

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] "'[We] must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].'" [Citation.]" [Citation.]'" (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) DCFS bears the burden to prove, by a preponderance of the evidence, that a child is a dependent of the court under section 300. (*I.J.*, at p. 773.)

It is undisputed that father did not sexually abuse or neglect J.S. before this matter was initiated. "But section 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction. These subdivisions . . . require only a 'substantial risk' that the child will be abused or neglected. The legislatively declared purpose of the provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.]" (*I.J.*, *supra*, 56 Cal.4th at p. 773.)

"'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In

8

such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*I.J.*, *supra*, 56 Cal.4th at p. 773.) Here, we focus on section 300, subdivision (d), the subdivision most closely describing the situation involving J.S. (See *id*. at pp. 773–774.)

Father contends there was insufficient evidence to support the assertion of dependency jurisdiction over J.S. because his sexual abuse of N.C and F.C. did not give rise to a reasonable inference that he would similarly abuse his son or that he had a sexual interest in boys.

Section 300, subdivision (d) is limited to cases in which a child either has been sexually abused himself, is at risk because of a parent's failure to protect him from sexual abuse about which the parent knew or should have known, or where the child faces a substantial future risk of sexual abuse as defined in Penal Code section 11165.1. Subdivision (d) protects the siblings of a victim of sexual abuse, and boys in a home in which a parent or guardian has sexually abused girls. (*I.J.*, *supra*, 56 Cal.4th at p. 776.)

Relying upon *In re Rubisela E.* (2000) 85 Cal.App.4th 177 (*Rubisela E.*), *In re P.A.* (2006) 144 Cal.App.4th 1339 (*P.A.*), and *In re Karen R.* (2002) 95 Cal.App.4th 84, (*Karen R.*) and distinguishing the facts here from those of *I.J.*, *supra*, 56 Cal.4th 766, father contends that J.S. was not at risk of sexual abuse based upon father's abuse of N.C. and F.C. This is so because J.S. was never inappropriately touched and never saw or knew about any inappropriate touching of his young nieces. Further, father argues there was no evidence to indicate he ever abused or had a proclivity to sexually abuse his own children, or any male minor, or that J.S. was at risk of any offense identified in Penal Code section 11165.1.

The California Supreme Court recently addressed this precise issue, albeit in a case with significantly more egregious sexual misconduct by the father. (*I.J.*, *supra*, 56 Cal.4th at p. 771.) Prior to the decision in *I.J.*, appellate courts were divided over the issue of whether evidence of sexual abuse of a child of one gender justified assertion of jurisdiction over a child of another gender. In *Rubisela E.*, *supra*, 85 Cal.App.4th 177, disapproved in part in *I.J.*, the court reversed a jurisdictional finding that three younger

9

brothers of a 13-year-old female victim of sexual abuse were at risk of similar abuse because there was no evidence the father engaged in any suspicious behavior toward the boys, and no evidence he had engaged in any homosexual actions or had homosexual tendencies. (*Rubisela E.*, at pp. 198–199.) Similarly, in *In re Maria R.* (2010) 185 Cal.App.4th 48 (*Maria R.*), disapproved in part in *I.J.*, the court reversed a jurisdictional finding over a young boy premised on his father's sexual abuse of the boy's older sisters, noting the lack of "any scientific authority or empirical evidence to support the conclusion that a person who sexually abuses a female child is likely to sexually abuse a male child." (*Maria R.*, at p. 68; see *In re Jordan R.* (2012) 205 Cal.App.4th 111, 137–138 (*Jordan R.*) [upholding finding that a three-year-old boy whose father had sexually abused his 13-year-old niece was not in danger of sexual abuse].)

Other courts had held essentially that any type of "aberrant sexual behavior by a parent places the victim's siblings who remain in the home at risk of aberrant sexual behavior." (See, e.g., *P.A.*, *supra*, 144 Cal.App.4th at p. 1347; *In re Andy G.* (2010) 183 Cal.App.4th 1405, 1414; *Karen R.*, *supra*, 95 Cal.App.4th at pp. 90–91.)

In *I.J.*, *supra*, 56 Cal.4th 766, the court addressed the question of "whether a father's sexual abuse of his daughter supports a determination that his sons are juvenile court dependents when there is no evidence the father sexually abused or otherwise mistreated the boys, and they were unaware of their sister's abuse." (*Id*. at p. 770, italics omitted.) In that case, the father's biological daughter was 14, and had three younger brothers, 12-year-old twins and an eight year old. (*Id*. at p. 771.) The court found the assertion of jurisdiction over the boys appropriate based on the father's prolonged sexual abuse (rape, oral copulation and digital penetration for more than three years) of his daughter, which was "'aberrant in the extreme.'" (*Id*. at pp. 770, 778.)

The father argued the evidence of abuse of his daughter, by itself, was not sufficient to support the jurisdictional findings with regard to his sons. (*I.J.*, *supra*, 56 Cal.4th at p. 772.) The court disagreed. It held that although it was safe to assume that father's other daughter was at greater risk of sexual abuse than were his sons, "this does not mean the risk to the sons is nonexistent or so insubstantial that the juvenile court may

10

not take steps to protect the sons from that risk. 'Although the danger of sexual abuse of a female sibling in such a situation may be greater than the danger of sexual abuse of a male sibling, the danger of sexual abuse to the male sibling is nonetheless still substantial.' [Citation.]" (*Id*. at pp. 779–780.)

The court focused in particular on section 355.1, subdivision (d), which provides that a finding of sexual abuse by a parent in a prior proceeding constitutes prima facie evidence that the child who is the subject of the current proceeding is subject to the court's jurisdiction. The court noted that when it enacted section 355.1, subdivision (d), the Legislature stated that the "'children of the State of California are placed at risk when permitted contact with a parent or caretaker who has committed a sex crime. . . .' (Stats. 1999, ch. 417, § 1, p. 2780.)" (*I.J., supra*, 56 Cal.4th at p. 779.) Acknowledging that section 355.1, subdivision (d) does not apply where the finding is made in the same proceeding, the court nevertheless found the statute "relevant because it evinces a legislative intent that sexual abuse of someone else, without more, at least supports a dependency finding." (*Ibid.*, italics omitted.) The court observed that "[n]othing in [section 355.1, subdivision (d)] suggests it is limited to sexual abuse of a person of the same gender as the child before the court." (*I.J.*, at p. 779.) The court cautioned, however, against interpreting its decision too broadly: "In upholding the assertion of jurisdiction in this case, we are not holding that the juvenile court is compelled, as a matter of law, to assume jurisdiction over all the children whenever one child is sexually abused. We merely hold the evidence in this case supports the juvenile court's assertion of jurisdiction." (*Id.* at p. 780.)[5]

*I.J., supra*, 56 Cal.4th at page 780, cited *Jordan R., supra*, 205 Cal.App.4th 111 with approval. In *Jordan R.*, the court affirmed the assertion of jurisdiction over the daughter of a man who sexually abused his 13-year-old niece but also affirmed the

---

[5] In so doing, the court disapproved, to the extent inconsistent with its holding, the decision in *Rubisela E., supra*, 85 Cal.App.4th 177, among others. (*I.J., supra*, 56 Cal.4th at p. 775.)

11

juvenile court's refusal to assert jurisdiction over the man's son.  (*Id*. at pp. 136–139.)
The father had sexually abused his niece by making sexual comments to her, asking her
for a lap dance and oral sex, which she performed, licking her breasts and genitals and
masturbating in her presence.  (*Id.* at p. 136.)  Notwithstanding the particularly sordid
nature of the abuse, the appellate court found it did not compel a finding that the father's
toddler son was at substantial risk of abuse.  Nothing in the record suggested the father
had inappropriately touched another male in a sexual manner and "abuse of a female
child, as aberrant as it is, does not establish, in and of itself, that a male child is at
substantial risk of sexual abuse."  (*Id*. at p. 138.)

Neither *Jordan R*., *supra*, 205 Cal.App.4th 111 or *I.J.*, *supra*, 56 Cal.4th 773 is
directly on point, in that this case does not involve the severe or prolonged sexual abuse
of a sibling.  This case more closely resembles *P.A.*, *supra*, 144 Cal.App.4th 1339, with
respect to the severity of the alleged abuse.  There, the juvenile court found substantial
evidence that on two occasions a father sexually abused his nine-year-old daughter by
touching her vagina under her clothes and over her underwear, conduct the court found
put the father's two younger sons, ages eight and five, at risk of sexual abuse.  Although
the abuse was less shocking than in either *Jordan R*. or *I.J*., the court concluded that
"where . . . a child has been sexually abused, any younger sibling who is approaching the
age at which the child was abused, may be found to be at risk of sexual abuse. . . .
[A]berrant sexual behavior by a parent places the victim's siblings who remain in the
home at risk of aberrant sexual behavior."  (*P.A.*, at p. 1347.)  It is noteworthy that *I.J.*
discussed *P.A*. and left its holding intact.  (*I.J.*, *supra*, 56 Cal.4th at pp. 775–776.)

In the instant case, the juvenile court found that the fact that J.S. was a boy was
not determinative, because both N.C. and F.C. were prepubescent at the time they were
abused, and there was not "much distinction in the body types" between J.S. and his
young nieces.  The court found the similarity in body type more compelling than the
girls' gender.  Moreover, there was also evidence that the sexual abuse of N.C. occurred
in the presence of other children, including J.S., who could easily have awakened and
observed it.  Further, the abuse of F.C. took place at the family's home, where J.S. was

12

similarly vulnerable to abuse. Thus it found dependency jurisdiction was properly exercised over J.S. under section 300, subdivision (d), based on the risk he would be sexually abused.

Father insists subdivision (d) is inapplicable here because J.S., his "biological child, . . . was male, . . . was not aware of any abuse to his nieces who were several years younger," and there was "no evidence that [J.S.] witnessed or was aware of [father]'s sexual conduct with them." Father maintains this case is unlike *Karen R.*, *supra*, 95 Cal.App.4th 84, because J.S. did not witness any sexual abuse which was, in any case, not incestuous. The record reflects otherwise. Father has been involved in a romantic relationship with the girls' grandmother for many years, has lived with her in the family home in which each victim resided at various times, and visited regularly. It is reasonable to infer that he was treated as part of the extended family during that time, at least before he went to live with another woman. Indeed, by virtue of his client's longstanding, live-in relationship with their grandmother, father's counsel conceded that his client and the girls were "kind of related." (See *In re Ricky T.* (2013) 214 Cal.App.4th 515, 523 [declining to distinguish line of cases addressing risk posed to sex abuse victim's siblings who were unrelated to their abuser, because victims knew him for years and considered him their grandfather].) We also reject father's attempt to distinguish *P.A.*, *supra*, 144 Cal.App.4th 1339, on the ground that J.S. had passed the age at which abuse of either girl began here. Father ignores the larger point made in *P.A.*, i.e., that "aberrant sexual behavior by a parent places the [children] who remain in the home at risk of aberrant sexual behavior." (*Id.* at p. 1347, fn. omitted.)

Father's argument also overlooks the limited nature of our review. We determine only whether the record contains substantial evidence, contradicted or not, to support the juvenile court's order. We cannot resolve evidentiary disputes or reweigh the evidence in a manner more favorable to father. Those tasks are exclusively within the province of the juvenile court. We also defer to the lower court on issues of credibility. (*In re E.B.* (2010) 184 Cal.App.4th 568, 574–575.) If substantial evidence supports the juvenile court's finding, it must be upheld even if other evidence would support a different

13

conclusion. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251.) Testimony by even "a single witness can be sufficient to uphold a judgment." (*Rubisela E.*, *supra*, 85 Cal.App.4th at p. 195.)

The extent of sexual abuse of female siblings need not rise to the level perpetrated in *I.J.*, *supra*, 56 Cal.4th 773 to affirm the exercise of jurisdiction over male siblings, or to affirm a dispositional order disallowing the perpetrator of the abuse to retain physical custody of a son. (See, e.g., *In re Andy G.*, *supra*, 183 Cal.App.4th at pp. 1407–1408 [abuse consisted of father fondling one sister's breast and fondling another's vagina, exposing his penis, and showing one sister a pornographic movie and masturbating in her presence]; *P.A.*, *supra*, 144 Cal.App.4th at pp. 1341–1343 [father twice touched daughter's vagina].) *I.J.* cited both cases with no indication of disapproval. (*I.J.*, at pp. 775–776.)

In sum, *I.J.*, *supra*, 56 Cal.4th 773 does not establish a minimum threshold. On the contrary, the case acknowledged that "'[s]ome risks may be substantial even though they carry a low degree of probability because the magnitude of the harm is potentially great. . . .'" (*Id.* at p. 778.) We believe the guidance *I.J.* provides is that appellate courts should not draw bright lines around categories of conduct in these cases. The juvenile court was not compelled to assume jurisdiction over J.S. because his younger nieces were sexually abused. There were factors to suggest J.S. was not likely to be at risk, including his gender, the absence of evidence that father had a sexual interest in boys, the fact that the girls were not related by blood and the lack of evidence J.S. himself was abused or neglected. There was, however, substantial evidence to suggest he was at risk. That evidence, including father's inexcusable sexual behavior with N.C. and F.C., J.S.'s young age and similarly prepubescent body, mother's feeble response to N.C.'s revelation of abuse, and her insistence on maintaining a relationship with father in the family home where he had unrestrained access to J.S. The court would have acted within its discretion had it declined jurisdiction over J.S. Nevertheless, on this record it was also reasonable to find that the circumstances surrounding the sexual abuse of N.C. and F.C. amounts to

14

substantial evidence supporting the judgment.  Accordingly, dependency jurisdiction was properly asserted over J.S. based on the risk of sexual abuse.**6**

2.      *The juvenile court's removal finding regarding J.S.*

Father contends there is insufficient evidence to support the juvenile court's order removing J.S. from his custody pursuant to section 361, subdivision (c)(1), and that the court failed to address whether DCFS made reasonable efforts to prevent J.S.'s removal.

Section 361, subdivision (c) provides:  "A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . .  [¶]  (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody. . . .  The court shall consider, as a reasonable means to protect the minor, . . . [¶] . . . [t]he option of removing an offending parent or guardian from the home."  The court shall also consider, as a reasonable means to protect the minor, "[a]llowing a nonoffending parent or guardian to retain physical custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm."  (§ 361, subd. (c)(2).)  A "parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate.  The focus of the statute is on averting harm to the child."  (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)

"The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order."  (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103–1104.)  We review a dispositional order removing a child

---

**6** Because there was sufficient evidence to support jurisdiction under section 300 subdivision (d), we need not consider father's claim that there was insubstantial evidence to support jurisdiction under subdivision (b) as to him.  (*I.J.*, *supra*, 56 Cal.4th at p. 773.)

15

from a parent for substantial evidence, bearing in mind that the juvenile court was required to make its order based on the higher standard of clear and convincing evidence. (*In re Ashly F*. (2014) 225 Cal.App.4th 803, 809.)

Here, the juvenile court found, "by clear and convincing evidence, pursuant to Welfare and Institutions Code section 361(c) that there is a substantial danger to the physical health, safety, protection, or physical or emotional well-being of [J.S.] if [he] were returned to the custody of the father. And there are no reasonable means by which [his] physical health can be protected without removing [him] from the father's custody." The court further found that "[r]easonable efforts were made to prevent and eliminate the need for [J.S.]'s removal."

Father contends there is insufficient evidence to support the order removing J.S. from his custody. The juvenile court was presented with evidence that father consistently denied any sexual abuse and that mother disbelieved the allegations and failed to protect the children from father because she wanted to maintain her relationship with him. The court reasonably concluded that mother's disbelief of the girls' accusations of abuse and her failure to keep father out of the home exposed J.S. to substantial risk of harm. Where a parent fails to acknowledge that abuse has occurred and been perpetrated upon a child, and where that failure may lead to further contact between the abuser and the children, a court may reasonably determine removal is proper. (See *In re Levi H*. (2011) 197 Cal.App.4th 1279, 1292 [mother did not believe her husband could have inflicted injuries upon her child and continued living with husband]; see also *In re Mariah T*. (2008) 159 Cal.App.4th 428, 440–441 [mother refused to believe boyfriend sexually abused daughter, chose to continue to live with boyfriend rather than to avoid having children placed outside the home].) On this record, according the juvenile court the deference to which its findings are entitled, we find there is sufficient evidence to support its finding J.S. faced substantial danger if he remained in father's custody.

Father also argues that DCFS failed to prove there were no reasonable means to protect J.S. short of removal. Father does not challenge the jurisdictional findings with regard to his sexual abuse of two young family members. He was a sexual predator and

16

the court was not required to ignore his history of aberrant behavior towards young children. Further, the record contains no evidence that father made any effort at remediation, or admitted any wrong-doing at all. Although father claims that J.S. "could have safely lived with [him]," he does not explain how that could have been accomplished in light of his refusal to acknowledge the abuse, and there is clear evidence to the contrary. Further, as discussed above, mother's presence in the home could not be considered a deterrent given her disbelief of her grandchildren's accusations and her failure to take protective action. This lends credence to the court's finding that it believed mother continued to pose a danger to the children because she was unwilling to protect them. Given mother's commitment to placing a priority on maintaining her relationship with father, and her failure to protect the children, there is sufficient evidence in this record to support the juvenile court's removal order. The court had a well-founded fear that mother would continue to disbelieve the allegations of abuse and permit father to remain in the home, allowing him the possibility of contact with the children. DCFS noted father's lack of progress regarding reunification services. The record reflects that the juvenile court made its dispositional findings by clear and convincing evidence and, as discussed above, substantial evidence supports the juvenile court's decision to remove J.S.

Further, the juvenile court considered an alternative to removing J.S., and permitted him to remain in mother's care as long as father moved out. For this reason, this case is unlike *In re Ashly F.*, *supra*, 225 Cal.App.4th 803, in which the juvenile court failed to consider "'as a reasonable means to protect the minor, the option of removing an offending parent . . . from the home.' (§ 361, subd. (c)(1).)" (*Id.* at p. 810.) The juvenile court's dispositional order finds substantial evidentiary support.

**DISPOSITION**

The order is affirmed.

NOT TO BE PUBLISHED.

JOHNSON, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.